**UNITED STATES of America, Plaintiff,**

v.

**Robert LEVINE, Defendant.**

**No. HCR 91–3.**

United States District Court,
N.D. Indiana,
Hammond Division.

May 10, 1991.

Ronald Kurpiers, Asst. U.S. Atty., Dyer, Ind., for plaintiff.

Kevin Milner, Chicago, Ill., for defendant.

## ORDER

LOZANO, District Judge.

This matter is before the court on the defendant's, Robert Levine ("Levine"), Motion for Revocation of Magistrate's Detention Order, filed on April 23, 1991. Levine requests review, pursuant to 18 U.S.C. § 3145(b), of a recent detention order entered by Magistrate Rodovich of the Northern District of Indiana. This court heard and considered argument and evidence at a hearing on the motion on May 3, 1991. At the hearing, the court denied Levine's motion and ordered him detained pursuant to Magistrate Rodovich's April 16, 1991 detention order. The purpose of this order is to detail the court's findings of fact and reasons for detaining the defendant.

PROCEDURAL BACKGROUND

A five count indictment was returned against Levine on January 11, 1991 alleging violations of 18 U.S.C. §§ 371 and 1958. The indictment charges that Levine conspired with a man named Bruce McKinney to murder his brother, Donald Levine, and Marsha and Mark Levine.[1] A warrant was issued for Levine's arrest. Initially, the indictment was ordered sealed after its return. However, on January 30, 1991, the indictment was ordered unsealed. In the event that Levine is convicted, he could receive a maximum penalty of life imprisonment without parole.

Levine surrendered on the warrant to federal agents in Los Angeles, California on March 4, 1991. He appeared before Magistrate George H. King of the Central District of California for a detention hearing on March 6, 1991. At this initial hear-

---

**1.** McKinney allegedly murdered Donald and Marsha Levine on November 9, 1989.

ing, the government submitted a proffer of evidence and Agent Grelecki of the Federal Bureau of Investigations testified. Upon consideration of the evidence proffered and presented at the hearing, Magistrate King issued an order detaining Levine. Levine subsequently waived extradition and returned to the Northern District of Indiana.

On April 4, 1991, Levine filed a motion seeking reconsideration of the initial detention order entered by Magistrate King. On April 15, 1991, Levine appeared before Magistrate Rodovich for a second detention hearing. Levine filed four exhibits, including his own affidavit. The government presented evidence by way of testimony of Agent Grelecki and by submission of several exhibits. At the conclusion of the hearing, Magistrate Rodovich denied Levine's motion to reconsider and ordered that Levine be detained. On April 16, 1991, Magistrate Rodovich filed a detention order detailing his findings and reasons for ordering Levine's detention.[2] Levine's current motion and the subsequent hearing on the matter followed.

## FACTUAL BACKGROUND

Agent Grelecki began investigating Levine some time in September 1990. From October 1990 through February 1991, Levine retained the services of an Arizona attorney named Jeffrey Ross. In October 1990, Ross notified Levine that he was a target in an investigation involving the murders of Donald and Marsha Levine. Also in October 1990, the government served Levine with a subpoena requiring him to appear before the grand jury on November 14, 1990 to provide handwriting exemplars, fingerprints, and photographs. Around that same time, a second subpoena was served on Levine requesting the production of business records. On November 14, 1990, Levine appeared before the grand jury and provided the handwriting exemplars, fingerprints and photographs. However, according to the government, Levine provided only a portion of the requested business records.

Levine lived in Arizona for the last 17 years or more and developed significant ties to the business community there. Within days after appearing before the grand jury in November 1990, Levine severed his ties and moved without leaving a new address or telephone number with his family or business associates. Levine's family members did not hear from Levine unless he or his wife initiated the contact. The government proffered that Levine told family members that he would rather die than go to jail. Levine's pets, left behind save one, were placed in an animal shelter.

Agent Grelecki testified that an attorney named Walter Siben was interviewed by a law enforcement officer with respect to a conversation Siben had with Levine. Specifically, Siben allegedly told the officer that Levine asked him "where don't they extradite people from?" and "if you're not under indictment, can you leave the country?" Levine contends by affidavit that the alleged conversation never took place. This contention is corroborated by an affidavit signed by Siben.

On December 17, 1990, the government issued another subpoena requiring Levine to appear before the grand jury on January 9, 1991 to provide additional handwriting exemplars and hair samples. Attorney Ross refused service of the subpoena, stating that he did not know how to contact Levine. The government notified Ross that Levine was to appear before the grand jury on January 10, 1991 to explain why certain business records had not been produced. Ross told the government that Levine was aware that he was to appear on that date and that Ross had no reason to think that Levine would not appear. Levine told his sister-in-law, Toby Stoffa, that he knew he was due to appear on January 10, 1991. However, Levine failed to appear before the grand jury and provide the requested materials.

Levine had been engaged in several business ventures in Arizona before he left.

---

**2.** Magistrate Rodovich relied to some extent on the initial hearing before Magistrate King. The parties also relied on that hearing in their arguments before this court. Therefore, this court considered the evidence proffered and presented at the hearing before Magistrate King in reaching its determination. Neither party has objected to this procedure.

By affidavit, Levine asserts that he still owns two businesses.[3] Before leaving Arizona, Levine sold another business. Levine and/or his wife told business associates that they would be leaving the country and that the associates may never see them again.

Levine filed for Chapter 11 reorganization in bankruptcy court in March 1990.[4] In fact, Levine asserts by affidavit that he put his Arizona house up for sale in January or February 1990 in an effort to avoid Chapter 11 reorganization. The government's testimony at the initial hearing tends to corroborate the timing with respect to the attempted sale of the house.[5]

Levine purchased a 1986 Buick Electra at an auction and titled it under the corporate name of a business called Antiquities, Inc., which was owned in part by Toby Stoffa and Levine's brother-in-law, Mitchell Menaker. Levine obtained a letter on Antiquities, Inc. stationery signed by Stoffa and addressed "To Whom It May Concern". The letter gave Levine or his wife "the right to take the 1986 Buick Electra out of the country with full permission from Antiquities". (Government Exhibit D–3)

Levine and his wife lived at various locations in California and Mexico from November 1990 through March 1991. During that time, Levine and his wife used several different aliases for various purposes. Steward obtained a mail drop box, a telephone voice mail contact, a California drivers license and a credit card in the name of Patricia Green.

Levine possesses and frequently has used an active, valid passport. Levine made several trips to Mexico in the spring of 1990 and enrolled in a "crash" course to learn Spanish. In January 1991, Levine traveled to Mexico on two or three differ-ent occasions. Levine attempted to rent a condominium in Mexico under an assumed name.

Sometime in January 1991, the Buick was towed from a condominium complex in San Diego, California. Levine had made arrangements with someone named Luz Fox to rent a condominium in that complex. Levine paid the security deposit with cash and used an assumed name in his dealings with Fox. Once the Buick was towed, Levine indicated to Fox that he did not want to rent the condominium and requested a refund. Although Levine wore a beard when he first met with Fox as he had for the last 15–20 years, Levine's beard disappeared after the Buick was towed. Levine called Mitchell Menaker and told him to report the car stolen.

When he left the condominium, Levine left behind groceries, clothes, books, a computer, and other documents. Between the abandoned condominium and the Buick, several miscellaneous items were recovered, including receipts obtained by Levine and his wife under various assumed names, an application for Mexican car insurance, a Mexican insurance form dated June 25, 1990, an Antiquities Inc. business card, a map of Mexico, and the telephone number of a Mexican dentist contacted by Levine in an effort to rent a condominium. (Government Exhibit D–4) A notebook found in the abandoned condominium outlined a detailed plan for activities such as losing weight, setting up alternate identifications, and establishing an address. (Government Exhibit D–1)

In late January 1991, Levine paid a visit to his stepson, Donald Steward, and asked him to rent a car in Steward's name. When Steward refused, Levine borrowed Steward's BMW. After driving the BMW for a time, Levine called Steward, disguised

---

**3.** Levine asserts that these two businesses were initiated after he filed for Chapter 11 reorganization and were spin-offs of his prior business endeavors.

**4.** The government's proffer of evidence at the initial hearing indicated that a threat against Levine's life had been made sometime in June 1990. Levine now asserts that the threat is currently of no concern.

**5.** Levine also owns property in Costa Rica. According to Levine's affidavit, that property is undeveloped to his knowledge. Neither has Levine seen the property or visited Costa Rica. No evidence was presented by the government to the contrary.

his voice and gave Steward directions to the car's location. In the car was a note with directions to pick up the remaining deposit and property left at the San Diego condominium previously abandoned. Levine had previously asked Steward to fill out an application for a cellular telephone.

Levine first learned of the indictment sometime between January 1991 and February 1, 1991.[6] On January 15, 1991, the government notified Attorney Ross of the warrant for Levine's arrest. Subsequently, Ross was supplied with a letter memorializing the January 15 telephone conversation (Government's Exhibit C, Government's Memorandum). Prior to January 30, 1990 when the indictment was unsealed, Agent Grelecki told many of Levine's relatives and friends about the indictment. Moreover, federal agents advised Levine's family and friends not to provide assistance to Levine while he remained a fugitive.

Instead of surrendering immediately, Levine hired a California attorney named Brent Carruth on or about February 5, 1991 to arrange his surrender. Levine sought assurances that he would be released on bond. Carruth and the government arranged for Levine to surrender on February 19, 1991. According to Levine's affidavit, Carruth failed to inform Levine of the surrender date because Carruth wanted a larger fee. Thus, Levine did not surrender on February 19, 1991. Levine submitted a document describing a retainer agreement between himself and Carruth wherein Carruth was to attempt to establish bail.

■ Levine fired Carruth and hired another California attorney named Mark Beck on February 28, 1991. Beck arranged for Levine to surrender on March 4, 1991. The government testified that during the negotiations leading to Levine's surrender, the government represented to Patricia Steward, her attorney, and Beck, that Steward would not be charged for her assistance in concealing Levine while he was a federal fugitive if Levine surrendered on March 4, 1991. Levine represented in oral argument before this court by way of proffer that Patricia Steward knew of no such agreement, but knew that conversations were had to that effect.[7]

Levine is a fifty (50) year old man without a criminal record. He has been married for 12 years and has four (4) children who are credits to the community. Levine is a prominent businessman who has dealt in real estate for several years. He has a Masters Degree in business and has completed 2 years of law school. Levine maintains that he has substantial ties to Arizona, including his immediate family, friends and business associates. Levine has been under the care of a psychiatrist for depression.

If released, Levine is prepared to turn over his passport. In addition, he would reside at his Arizona address and continue employment with his two remaining real estate companies out of his home. Levine contends that he is willing to rent a home or apartment in this district, although he desires to be close to his 80 year old ailing mother who resides in Arizona. Further, Levine's relatives stand ready to assign their interest in a home as collateral for any bond imposed by the court. The home is valued in excess of $100,000. Levine is prepared to ask other family members for assignments of their properties as well. Moreover, were Levine to flee, he would stand to lose approximately $2,450,000.00. Finally, Levine states that he is innocent of the charges against him, that he has no desire to flee and that release from detention would allow him to more effectively prepare for trial.

---

6. The government's proffer of evidence at the initial hearing indicated that Levine knew about the indictment before his second trip to Mexico. The proposition was based on compounded hearsay. At the second hearing, the government testified that Christine Steward, Levine's daughter, told Levine about the existence of the arrest warrant against Levine late in January 1991. Levine contends that he did not know about the indictment until February 1, 1991 after it was unsealed.

7. The decision whether to allow a defendant to present or proffer additional evidence in a § 3145(b) hearing rests within the district court's discretion. *United States v. Shaker*, 665 F.Supp. 698, 704 (N.D.Ind.1987).

## DISCUSSION

■ Section 3145(b) provides for district court review of a magistrate's release or detention order. When reviewing a magistrate's determination, a district court must conduct a *de novo* review and need not defer to the magistrate's findings. *United States v. Shaker*, 665 F.Supp. 698, 701 (N.D.Ind.1987) (citations omitted).

■ The Bail Reform Act of 1984 provides for pre-trial detention of a defendant unless a condition or combination of conditions will reasonably assure (1) the defendant's appearance as required and (2) the safety of any other person and the community. 18 U.S.C. § 3142(e). The burden is on the government to prove either that the defendant is a flight risk or a danger to the community. *United States v. Daniels*, 772 F.2d 382, 383 (7th Cir.1985). The parties agree that only the flight risk prong of the Bail Reform Act is at issue for purposes of this motion. Under the flight risk element of the statute, the government need only prove by a preponderance of evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required. *United States v. Shaker*, 665 F.Supp. 698, 703 (N.D.Ind. 1987) (citations omitted). A district court need not be guaranteed that a defendant will not flee. *United States v. Orta*, 760 F.2d 887, 889–92 (8th Cir.1985). Rather, the court need only have a reasonable assurance of the defendant's appearance. *Id.* [8]

■ In determining whether the government has carried its burden of proof, the court may consider several factors. 18 U.S.C. § 3142(g). The factors pertinent to this matter include:

(1) The nature and circumstances of the offense charged, including whether the offense is a crime of violence ...;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

(A) his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, ... and record concerning appearance at court proceedings;

.    .    .    .    .

*Id.* The evidence presented to the court at a detention hearing is not limited by the rules governing the admissibility of evidence in a criminal trial. 18 U.S.C. § 3142(f). Further, a court should give weight to the fact that persons facing heavy sentences for particular types of offenses are likely to flee. *United States v. Leibowitz*, 652 F.Supp. 591, 596 (N.D.Ind. 1987) (citing *United States v. Diaz* 777 F.2d 1236 (7th Cir.1985) (district court indicated that such weight should be given even where statutory presumption does not apply)); *see also United States v. Shaker*, 665 F.Supp. 698, 704 (N.D.Ind.1987). Based on the evidence presented and proffered, this court finds as follows:

■ Pursuant to the first factor enumerated at 18 U.S.C. § 3142(g), the nature and circumstances of the offense charged in the instant indictment against Levine are serious indeed. The underlying event charged is murder, a crime of violence. While this court presumes that the defendant is in fact innocent until proven otherwise, that presumption, as well as Levine's assertion that he is innocent and anticipating trial, does not necessarily provide reasonable assurance that Levine will not flee if released from detention. Levine faces serious charges and the possibility of life imprisonment without parole. He thus has a strong motive to flee, and has demonstrated the ability and capacity to do so in the past. Indeed, Levine himself has indicated that he was "in flight" prior to his learning of the indictment.[9] The nature and circumstances of the offense charged and the possible sentence should a conviction occur provide Levine with strong motivation to flee again, as before, despite his assur-

---

8. In some cases, the statute creates a rebuttable presumption in favor of detention. 18 U.S.C. § 3142(e). Both parties agree that the presumption does not apply here.

9. Levine argued that he was "buying time", "getting his head together", and that he "knew what was coming".

ances to the contrary, the existence of an indictment, the sacrifices he is willing to make to avoid detention [10] and the money he stands to lose should he flee. Moreover, the defendant's assurances in this respect are wholly self-serving and not credible, particularly in light of his past behaviors. In this instance especially, actions speak louder than words.

Section 3142(g) also mandates that the court consider the weight of the evidence against Levine. The government argues that the evidence alleged in the indictment is corroborative of detailed testimony to be presented by Bruce William McKinney. Admittedly, as Levine contends, the credibility of McKinney is questionable, and Levine fully expects to be acquitted at trial. However, Levine has not presented argument or evidence to refute the corroborative evidence alleged by the government.

The final relevant factor this court must consider is Levine's history and characteristics. Levine abandoned his home, family, business relations and pets, sold one business and abandoned two others within days after his appearance before the grand jury and learning that he was a target of the investigation. Moreover, Levine remained at whereabouts unknown either to the authorities or his family for approximately four months, sometimes changing his appearance, using aliases, learning Spanish, and moving place to place in vehicles owned by others in an effort to remain in hiding, either from the investigation leading to the charges herein, from creditors, or both. Levine made trips to Mexico where he attempted to establish a residence. Some of this activity was documented in a written plan indicating that his intentions to flee were calculated previously. All of this occurred despite Levine's extensive family and business ties to his community in Arizona.

Furthermore, Levine failed to appear before the grand jury on January 10, 1991. While the question of whether Levine was properly served with the December 17, 1990 subpoena requesting additional hand-

writing exemplars and head hair samples remains disputed, the court need not resolve that issue for purposes of this motion. It is undisputed that Levine was properly served with an earlier subpoena requesting business records. The government suspected that Levine did not fully comply with that request. As a result, the government notified Attorney Ross, who was acting as receiver of service for Levine, that Levine's presence before the grand jury was requested pursuant to the business records subpoena previously served on Levine through Ross. Levine knew he was to appear before the grand jury on January 10, 1991 and he failed to do so.

In addition, Levine's surrender on March 4, 1991 was not a voluntary one. Although Levine disputes the existence of an agreement not to prosecute his wife in exchange for his surrender on March 4, 1991, Levine admits by proffer that his wife knew at the time that conversations were had to that effect. The government's testimony certainly corroborates that proffer and outlines the government's involvement in those conversations. Moreover, even without such an agreement, considerable pressure by the FBI was being placed on Levine's friends and family members in efforts to warn them not to provide assistance to Levine. Indeed, many of Levine's attempts to obtain assistance from family members failed. This pressure, combined with the possibility that prosecution of his wife could be avoided, is enough evidence to allow this court to construe Levine's surrender as less than voluntary.

This is true even assuming, *arguendo*, that Levine learned of the indictment on February 1, 1991, contacted Carruth on or about February 5, 1991 to arrange a surrender, and was not informed of the initial February 19, 1991 surrender date. That the FBI was closing in, that Levine contacted Carruth and that Carruth failed to inform Levine of the February 19, 1991 surrender date are all events consistent with this court's finding that Levine felt pres-

**10.** Levine has offered to hand his passport over to authorities pending the outcome of trial. This court notes that passports are not needed for American citizens to gain entry to Mexico. Because Levine traveled to Mexico to avoid authorities and possibly creditors in the past, the court is not reassured by Levine's willingness to give up his passport.

sured to surrender and that his surrender was less than voluntary. Levine's assertions that he was motivated by a good faith change of heart are self-serving and not credible based on evidence to the contrary. Moreover, Levine admits that he should have surrendered as soon as he learned of the indictment. Indeed, Levine could have surrendered sooner than March 4, 1991, but he failed to do so.[11] The facts are that Levine fled prior to the return of the indictment and remained at large after he learned of charges against him.

Nor is this court persuaded by Levine's argument that if an agreement not to prosecute his wife existed, he would be motivated to appear if released in order to avoid negating the deal. The evidence shows that Levine's wife accompanied Levine while he remained at large, used aliases and is therefore prone and capable in her own right of fleeing authorities with Levine, if necessary. Levine does not argue otherwise.

In addition, Levine is currently experiencing a volatile financial situation. He has received treatment from a psychiatrist. His brother has recently died. He has no ties in Indiana and he recently and thoroughly severed his ties in Arizona. His ability to sustain businesses from his home is questionable, considering his financial status. Even if Levine plans to appear as required if released, and only fled previously to avoid creditors, the evidence of Levine's history and character suggests that he has the motivation, capacity and propensity to avoid confrontation at a moments notice.

This court's decision remains unaffected by the affidavits submitted by Levine and Walter Siben tending to establish that the conversation between them as alleged by the government never occurred. In light of all the evidence, whether or not Levine spoke to Siben with respect to extradition and flight does not negate the finding that the government has established by a preponderance of the evidence that Levine remains a flight risk. Levine argues that

even if he is a flight risk, some combination of conditions would reasonably assure his appearance at trial. At the hearing before this court, Levine asserted that he was agreeable to any conditions imposed. Levine proposed the following conditions: twenty-four hour restriction to his home, unannounced visits by authorities, call-ins by Levine several times per day, pen register, electronic surveillance bracelet, and restriction of visitors, place of abode and travel. By his motion, Levine also suggested daily appearances at a pretrial services office, posting of cash bond, and government monitoring of telephone calls. Finally, Levine points to 18 U.S.C. § 3142(c), which provides for the following additional conditions: custody with a designated person, employment or educational programs, restricted contact with potential witnesses, alleged victims of the crime, or other personal associates, compliance with a specified curfew, restricted use of a weapon, restricted use of alcohol or drugs, psychiatric treatment, forfeiture of property, execution of a bail bond and return to custody at specified times.

In support of his assertion, Levine cites a number of cases wherein defendants were released on bond with certain conditions. *See United States v. Friedman*, 837 F.2d 48 (2nd Cir.1988); *United States v. Orta*, 760 F.2d 887 (8th Cir.1985); *United States v. Motamedi*, 767 F.2d 1403 (9th Cir.1985); *United States v. O'Brien*, 895 F.2d 810 (1st Cir.1990). Initially, this court notes that none of the defendants in these cases displayed the intentional, evasive and systematic conduct exhibited by Levine once he learned he was a target of investigation. Moreover, as articulated previously, Levine has a strong motive to avoid prosecution considering the nature of the charges against him and the possibility of life imprisonment. Prosecution for contempt of court, and forfeiture of property and cash bonds previously posted seem to be unlikely deterrents for someone facing the possibility of a life sentence.

More important to consider on the question of conditions, however, is Levine's pro-

---

**11.** Levine initially attempted to surrender through Carruth subject to the condition that he

be released on bond prior to trial.

pensity and ability toward avoiding authorities when threatened. He is highly educated. His endeavors to elude authorities in Mexico were based on a calculated plan put into action within a short time frame. Certainly, Levine has shown the capacity to "disappear into thin air." [12] Accordingly, no set of conditions suggested by Levine or otherwise considered by this court would reasonably assure Levine's appearance as required. For example, pen register monitoring could be eluded by registering telephones to a different name, or calls could be made from cellular or cordless phones. Telephone wire taps are rendered useless by the occupants' refusal to communicate by phone. While electronic surveillance bracelets are available in the Chicago area, they are of limited value, in that the bracelet merely notifies authorities that flight has commenced. The bracelets do not assist in tracking a fugitive after he or she has escaped the 150 foot radius allowed by the device. In addition, Levine could simply fail to comply with the majority of suggested conditions by fleeing at times calculated to avoid unannounced visits by authorities and before returning to custody at designated times if required. Accordingly, this court is not persuaded by Levine's argument that conditions exist to reasonably assure that he would appear as required if released.

Finally, Levine contends that his continued detention makes preparation of his case difficult. However, pursuant to 18 U.S.C. § 3142(i), Magistrate Rodovich's order provided for reasonable opportunities for private consultation with his attorney. Thus, the statute contemplated such difficulties and arranged for courts to allow for effective preparation for trial. Moreover, counsel for Levine works out of an office in relative proximity to Levine's present location at the Metropolitan Correctional Center.

CONCLUSION

Based on the evidence submitted or proffered at the hearings before Magistrates King and Rodovich, and arguments of counsel, the court now FINDS that the government has carried its burden of showing by a preponderance of the evidence that Levine is a flight risk and that no condition or combination of conditions will reasonably assure Levine's appearance as required. Accordingly, the Defendant's Motion for Revocation of Magistrate's Detention Order is DENIED.

Pursuant to 18 U.S.C. § 3142(i), it is HEREBY ORDERED that:

A. The defendant shall be committed to the custody of the Attorney General for confinement to a corrections facility separate, to the extent practicable, from persons who are confined after a conviction;

B. The defendant shall be afforded reasonable opportunities for private consultation with his attorney; and

C. The defendant shall be delivered to the custody of the United States Marshal when the appearance of the defendant for any court proceeding is required.

---

12. Indeed, in oral argument, Levine asserted that he could have disappeared into thin air when he learned of the indictment.