UNITED STATES of America,

v.

Chaim HOLLENDER, Defendant.

No. 01 CR.216(CM).

United States District Court,
S.D. New York.

Sept. 12, 2001.

## DECISION AND ORDER ON BAIL APPLICATION

McMAHON, District Judge.

Defendant Chaim Hollender stands indicted by a grand jury of over thirty counts of various types of fraud—wire, mail credit card and bank frauds—as well as racketeering, conspiracy under the Racketeering and Corrupt Practices Act (RICO), and money laundering. Hollender faces an estimated total of 121 to 151 months of imprisonment if convicted.

Hollender's application for bail, opposed by the Government, was denied by United States Magistrate Judge Mark D. Fox, on the ground that (1) the charges against Hollender were extremely serious and the evidence against Hollender was extremely strong; (2) defendant made misrepresentations about his business interests to pretrial services upon arrest; (3) he has ties to Israel and appeared to have sent funds to Israel; (4) Hollender appeared to have the ability to create false travel documents and identification documents on a computer, including passports and drivers' licenses. (Tr. of Hearing before The Hon. Mark D. Fox, U.S.M.J., attached as Ex. C to Government's Letter Brief of September 11, 2001, at 27–28).

Hollender appealed the denial to this Court, which also refused to grant bail. On June 12, 2001, this Court concluded that Hollender represented a high risk of flight, and that the package proposed (a $500,000 personal recognizance bond, secured with real property put up by defendant's father, coupled with the personal assurances of two rabbis from defendant's community that defendant would appear, and home detention with electronic monitoring) was insufficient in at least two ways. First, Defendant's father, David Hollender, was not a satisfactory guarantor, in that he himself was under investigation due to his possible participation in

schemes the same or similar to those charged in the indictment. Second, the amount of the bond proposed was "woefully inadequate" (my words) in view of the seriousness of the crimes charged, the evidence connecting Hollender to those crimes, and the risk of flight.

On August 16, 2001, the United States Court of Appeals for the Second Circuit remanded the case to this Court for the limited purpose of having me clarify my findings as to the availability of a condition or combination of conditions that can reasonably assure Hollender's appearance. In that regard, the Second Circuit directed that this Court "conduct further proceedings as may be appropriate in the circumstances, including an evidentiary hearing, and enter its findings of fact and conclusions of law as to the matter noted above, and as to any other relevant matters." (Mandate, at 6)

Following the issuance of the mandate, Hollender proposed a new bail package, withdrawing Mr. Hollender's father as a guarantor, adding additional rabbis from the community as co-signers, adding a second home as security for the proposed $500,000 bond (despite this Court's admonition, defendant did not propose to increase the amount), and adding a condition that no computers be allowed in the Hollender home for any purpose. As to the last condition, defendant's father assured defense counsel that he does not allow computers to be used in his home. This representation was repeated to the Court.

After reviewing the mandate and consulting with the parties, the Court determined to hold an evidentiary hearing, as it appeared (to the Court, anyway) that one

was contemplated by the Court of Appeals.[1] This was done, on September 10, 2001. The Government submitted a letter brief, together with several inches of exhibits seized during the search of Mr. Hollender's office and/or the office of co-defendant Mordechai Samet, in support of its motion for detention. The Government also put Pre-Trial Services Officer Scott Kowall on the stand. Officer Kowall testified that Pre-Trial services could not presently guarantee the effectiveness of electronic monitoring in the Hollender home, due to the presence of "call waiting" and "call forwarding" features on the Hollenders' one telephone line. He also indicated that there was no way that Pre-Trial Services could visit the Hollender home more than once or perhaps twice a week, consistent with its responsibilities to over 100 other defendants currently under supervision out of the White Plains office; and stated that there was no way, short of being present at the Hollender home on a 24/7 basis, to ensure that no computers (including Palms, cell phones with internet capability, and small personal computers) were smuggled into the Hollender residence.

Defense counsel argued to the Court that the Government's showing was insufficient in view of the mandate, in that the Government had not put on any witnesses to authenticate the documents—or to tie them conclusively to Mr. Hollender, his residence or office—choosing instead to proceed by proffer. He also argued that the authorities relied on by the Government to support detention of his client were not pertinent, since they all involved factors that were not present in Mr. Hollender's case (including specifically prior

---

1. The Court is well aware that the Government frequently proceeds by proffer at a bail hearing, and ordinarily has no problem with that procedure. As I read the mandate, however, the Second Circuit panel "sent a mes-

sage" to this Court suggesting that something more than the usual procedure might be called for in Mr. Hollender's case. The Government disagrees. Only the panel knows for sure.

incidents of flight or failure to appear in connection with other charges).

The Court took the matter under submission, albeit promising a decision within 24 hours due to the imminence of the High Holy Days. The World Trade Center attack and evacuation of all Federal buildings prevented timely completion of the opinion. The following constitute my findings of fact, conclusions of law, and discussion.

■ Section 3142(e) requires a district court to order a defendant detained pending trial if "no condition or combination of conditions will reasonably assure the appearance of the person as required ..." 18 U.S.C. § 3142(e). The district court has a duty to engage in a two-step inquiry before ordering a defendant released or detained pending trial. First, the court must make a finding as to whether the defendant presents a risk of flight if not detained. Second, if the defendant is likely to flee, the court must determine whether some set of conditions would sufficiently vitiate that risk *United States v. Shakur*, 817 F.2d 189, 194 (2d Cir.1987).

■ In making the latter determination, Section 3142(g) requires this court to take into account four statutory factors: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including his character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (4) the nature and seriousness of the danger to any person or community that would be posed by the person's release. The weight to be accorded to each of these factors rests in the Court's discretion. However,

any finding must be supported by a preponderance of the evidence, and the burden of proof rests with the Government. *United States v. Martir*, 782 F.2d 1141, 1146 (2d Cir.1986).

1. Risk of Flight

■ At the June 12, 2001 hearing, the Court concluded that Hollender presented a risk of flight. He is a young man, looking at the possibility of spending the most productive years of his life in a Federal prison. Moreover, he is accused of having obtained in excess of $2 million in connection with a series of frauds. The Government has not yet located all of that money—indeed, it has not located most of that money—but it has presented evidence that places some of the money in bank accounts in the Middle East and Canada. I find that the Government's proffered evidence in this regard (which can be found at Exhibits H and I to the Government's Letter Brief dated September 10, 2001) is credible, and suffices to raise an inference that Hollender has the wherewithal both to flee and to support himself in a new life elsewhere. Finally, the Government has proffered ample evidence tending to show that Hollender has used fictitious names in the past (notably the name "Joe Andyman"), and that he has the ability, by using computers, to create false travel documents and credits cards for himself. Exemplars of templates for forged passports, as well as false identity documents, were found on the computer used by him in the office he shared with co-defendant Moses Weiss at 581 Route 17M in Monroe, New York. Taken together, this evidence is more than sufficient to support a finding that Chaim Hollender presents a risk of flight.

The Second Circuit did not quarrel with my finding concerning risk of flight. Instead, it sent the matter back so that I

could supplement my findings of the availability of conditions to ensure defendant's appearance. Since reaching this question presupposes that risk of flight has already been found, I therefore turn to the four statutory factors that must be considered once I have concluded, as I did and do find, that Mr. Hollender presents a risk of flight.[2]

## 2. Conditions to Vitiate Risk of Flight

■ In my opinion, two of the four statutory factors strongly favor detention, one does not and one is equivocal.

### a. Nature and Circumstances of Crime Charged

The first factor is the nature and circumstances of the crime charged. Mr. Hollender is alleged to have been one of three master-minds behind a series of fraud schemes—some petty, some grandiose—that, taken collectively, netted at least $4 million, much of which has yet to be located by the Government.

As is true with all frauds, the accusations against Hollender involve charges of deception. In his particular case, it is the nature of the deception that is important. First, Hollender is alleged to have made extensive use of what I will call "identity theft." That is, he and his co-defendants allegedly did two things: they created fictitious identities (both individuals, like "Joe Andyman," and businesses, such as H & W Trading or Abe's Close-outs) and manufactured various identity documents (including passports and credit cards) so that those "persons" would be "real;" and they exercised control over the identities of real people other than themselves. The former were allegedly created so that the various frauds would escape detection, or would not be traceable to the defendants.

The latter were in some cases integral to the fraudulent schemes themselves. To take one example: Hollender and perhaps his father allegedly submitted applications to obtain insurance on the lives of particular persons, while giving a different person's social security number. A worksheet regarding an insurance policy application was seized from Hollender's office. It contained two social security numbers: one for an individual named Shloma Kaller, who was to be the insured under the policy, and one for an individual named Wen Yang. Mr. Yang's social security number was listed on Mr. Kaller's application for insurance. (Ex. D to the Government's Letter Brief of September 10, 2001). The Government has indicated to the Court that it has obtained multiple exemplars of this sort of fraud during its search of defendant's office.

The Government does not limit is proffer of identity theft to the area of insurance. Mr. Hollender is also alleged to have been involved in bank frauds that involved the presentation of counterfeit checks for deposit in bank accounts under fictitious names. Exhibits S and T to the Government's September 10, 2001 submission consist of credit cards and identification documents that the Government represents were seized from Hollender's home on the day of his arrest. Some of those credit cards were in the names of dummy corporations, such as Abe's Closeouts, that were allegedly used as fronts to receive money obtained via fraud; and the Government did offer evidence that Hollender, through Abe's Closeouts, received money and deposited it into a bank account abroad (Ex. H and I).

As noted above, Hollender's home and office contained numerous identity documents—drivers' licenses, credit cards, passports (US, Canadian and Israeli), even

---

**2.** Defense counsel did not attempt to make an issue of risk of flight at the remand hearing.

naturalization papers—in the names of members of the Samet family and others. These documents, which contain identifying information, including birthdates, social security numbers and addresses, could easily be used by a knowledgeable person to create false identity documents for himself. Exhibit U, which consists of material seized from Hollender's personal computer, strongly suggests that Hollender—who is known as "Jeff"—was just such an individual. According to computer logs, someone named "Jeff" allegedly created templates for phony passports on his computer. Exhibit U contains templates for the creation of a U.S. passport, a template for the creation of an Israeli birth certificate, and identifying information concerning six individuals, prepared by "Jeff" using the unusual and familiar typeface employed by the United States Department of State on U.S. passports.

After reviewing these documents, the Court finds that the Government has established, by a preponderance of the evidence, that Hollender has both the ability and the wherewithal to create bogus identity documents.

Thus, we have the fact that Hollender is alleged to have been deeply implicated in crimes the nature and circumstances of which involve deception; that those deceptions are alleged to have included the use of false and fictitious identities, both individual and corporate; and that sophisticated supporting documentation manufactured to assist in the use of those identities appears was seized from Hollender's home and office. Judge Fox and I both previously concluded that these facts strongly supported a finding that there was no condition or set of conditions that would reasonably assure defendant's appearance. I support this conclusion even more strongly today.

I realize that some of this evidence, notably the evidence about the creation of false identity documents, bears directly on the *risk* of flight, an issue that has already been determined. However, that does not mean that it is to be ignored in evaluating the nature and circumstances of the crime, which is one of the statutory factors that must be considered in determining the propriety of bail. Viewing the Government's evidence of Hollender's *ability* to flee in light of the nature and circumstances of the crime, and in view of the substantial risk of flight that it portends, I conclude that the first § 3142(g) factor—the nature and circumstances of the crime—must be accorded the maximum possible weight. It is virtually determinative of the question of bail, standing alone.

Yet another aspect of the nature and circumstances of the crime bears on the propriety of bail. Hollender is alleged to have been involved in mail frauds appealing to the charitable instincts of his co-religionists. The Government has presented evidence, in the form of fundraising letters recovered from Hollender's computer, suggesting that Hollender asked for money from various individuals for the purpose of assisting fictitious Jews who were allegedly in financial difficulty; and has advised the Court that checks were sent to the Samet Group's mail drops in response to those appeals (Letter Brief of September 10, 2001, Ex. N, O and P). The Government has also presented the Court with a draft of a letter that was written to a rather substantial donor to one of these phony charitable appeals. (Letter Brief of September 10, 2001, Ex. Q) This evidence of Hollender's preying on the religious and cultural sensibilities of the Jewish community strongly suggests to the Court that Hollender would not be amenable to the moral suasion of bail—whether from rabbis or from his neighbors, who might be

persuaded to put up their homes as collateral for his release.

### b. Weight of Evidence

The second factor for me to consider is the weight of the evidence against Mr. Hollender. Simply put, the evidence against him is substantial, and much of it is not circumstantial. Hollender's voice can be heard on tapes of intercepted telephone conversations, discussing the particulars of a fraudulent credit card scheme. He appears on a bank video camera while depositing counterfeit checks in a fictitious name. Large numbers of documents implicating him in frauds were seized from his home and office, including phony charitable solicitations that went out in the mail over his real name. In short, while I continue to presume him innocent, I cannot ignore the fact that Hollender may well be convicted of very serious crimes, which carry with them very lengthy penalties. Thus, the second § 3142(g) factor also counsels strongly in favor of finding that no set of conditions will reasonably assure defendant's appearance.

### c. Personal History and Characteristics

The third factor is far more equivocal; some aspects favor bail and some do not. Hollender has no prior criminal record and he has never been arrested. This favors bail. He has never before failed to appear when required by a Court, but that is only because he has never before been required to appear in any Court, so I do not give this too much weight. He is a United States citizen, who grew up in this District, and who has strong family and community ties in this District. He has no documented history of drug or alcohol abuse. He also has no history of violence. All these augur in favor of setting bail. As to his character and past conduct, given the nature of the charges and the evidence thus far disclosed by the Government, which strongly suggests that Hollender has been involved in nefarious activities for some time, I can hardly place too much weight on such matters as his lack of a prior arrest record. Moreover, Hollender's "employment" appears to consist of his association with the various schemes charged in the indictment. I have been presented with no evidence that Hollender has held any other job. These factors suggest that bail may prove a risky investment.

### d. Danger to Community

Finally, I turn to the fourth § 3142(g) factor, which is danger to the community. I am not permitted to conclude that Hollender presents a danger to society, even though I believe that anyone who has the demonstrated ability and inclination to steal someone else's identity presents the gravest sort of risk—one that Congress and the United States Sentencing Commission have not sufficiently considered in this day and age of computerized crime. Thus, the fourth factor suggests that bail should be set.

Given the weight that I accord to § 3142(g) factors, I conclude that the four statutory factors, taken together, fall on the side of denying bail.[3]

---

3. This is true regardless of Defendant's citizenship. The Court of Appeals asked the parties whether any court had ever denied bail to a United States citizen (like Mr. Hollender) solely on the basis of "risk of flight." Of course, this Court would protest that I did not initially deny bail solely on the basis of risk of flight. But putting that to one side, I note that courts have indeed denied bail to United States citizens exclusively or primarily because of the risk of flight. *United States v. Barnett,* 986 F.Supp. 405 (W.D.La.1997); *United States v. Falcon,* 930 F.Supp. 1518 (S.D.Fla.1996); *United States v. Powell,* 813

### 3. Defendant's Proposed Conditions

■ I turn last to the issue of the specific conditions for bail that have been proposed by defendant. Independent of the inadequate amount of bail proposed by defendant[4], and the lack of sufficient security therefor, there are two other key conditions of pre-trial release about which the Court would have to be satisfied: the ability to perform electronic monitoring, and the ability to keep Hollender from access to a computer of any sort. Failure to convince me that either of these conditions can be met would be, in the opinion of the Court, fatal to a bail application.

I find that, in the case of defendant Hollender, it would be feasible to carry out home confinement using electronic monitoring. The testimony of Pre–Trial Services Officer Kowall did not establish otherwise. While Agent Kowall was unable to get a "location verify complete" reading from the monitoring company when he tested the phone line last Friday, it appears that this was because the Hollender family still has certain services (call waiting and call forwarding) on its one and only telephone line, which services are known to interfere with electronic monitor-

ing. The family could overcome this impediment simply by disabling those features, and the Court harbors no doubt that it would do so in order to secure defendant's release.

The Court particularly notes that there is only one telephone line coming into the Hollender home (which was not the case in either the homes of his detained co-defendants, Moses Weiss or Mordechai Samet). Moreover, there are no unused jacks in the Hollender home that could be used to reconnect disabled lines if there were any (which there are not). Thus, it would appear that Pretrial Services does have the ability to monitor whether a computer modem (which is an illegal feature) is being used, because in the Hollender home (unlike the Samet or Weiss homes), it would interfere with electronic monitoring. And it goes without saying (though I shall say it) that because the Hollender family resides in a single family home, there is no concern, as there was in the Weiss and Samet cases, about Pretrial Services' ability to be sure that the defendant actually remains in his place of residence. I so found on June 12, 2001, and I have no

F.Supp. 903 (D.Mass.1992); *United States v. Levine*, 770 F.Supp. 460 (N.D.Ind.1991); *United States v. Cole*, 715 F.Supp. 677 (E.D.Pa.1988). As able defense counsel points out, those cases involved facts bearing on risk of flight that are not present in Hollender's case: *tenuous ties to the community, Barnett*, 986 F Supp. at 405; prior non-appearance in court, *Falcon*, 930 F.Supp. at 1518; *Powell*, 813 F.Supp. at 903; direct evidence of efforts to flee the jurisdiction, *Levine*, 770 F.Supp. at 460; and direct evidence of intent to flee. *Cole*, 715 F.Supp. at 677. However, there are troubling factors in this case that were not present in those cases, including the defendant's apparent expertise in creating false identity documents, his access to templates for those documents, his transfer of substantial sums of money to Israel, and his use of false identities. Citizenship is but one factor that a court must consider in

deciding whether a defendant should be denied bail, and where other factors strongly suggest that the defendant's appearance cannot reasonably be assured, it carries lesser weight.

4. Notwithstanding the fact that this Court has already indicated that a $500,000 personal recognizance bond would be a "woefully inadequate," defendant does not propose a higher amount. Of course, this Court could set bail in a higher amount if I were convinced that it was among the conditions that would reasonably assure defendant's appearance at trial. Since I am not convinced that any set of conditions would provide the necessary assurance, I do not need to reach the question of how much more than $500,000 would be enough, or what portion of that would need to be secured.

reason to overturn that finding in view of Agent Kowall's testimony yesterday.

While the Government protests that electronic monitoring provides insufficient security, because all it can do is tell Pretrial Services that the defendant has fled—it cannot prevent him from fleeing—that is true in every case. Electronic monitoring is not the equivalent of having a camera trained on an accused 24 hours a day. However, if the tightest possible ranges (which the Court understands to be 35 feet, based on testimony elicited in the Samet and Weiss bail hearings) are employed, and if the monitoring works properly, Pretrial Services would be notified immediately should Hollender slip into either a neighbor's home or an automobile, and could obtain a warrant within the hour. The Court understands that this is not a perfect solution, but nothing short of pre-trial detention can absolutely ensure a defendant's appearance at trial. The statutory requirement is for a reasonable assurance of appearance, not an absolute assurance.

The computer issue is, however, far more troubling. This Court cannot over-emphasize its concern about the possibility that a person skilled in identity theft and the creation of forged documents using a computer may employ that skill to facilitate flight (or to commit additional frauds). This is not a concern in every case where fraud is committed. It is a concern in this particular case, given the nature of the accusations and the evidence seized from the defendant's home and office. It is also a concern given the fact that one of the indicted co-conspirators remains a fugitive, and other potential co-conspirators are still under investigation.

Defendant proposes, as a condition of bail, that no computers be allowed into the Hollender home for any purpose. He represents that his father does not permit computers in the home, and asks that the Court accept this representation as a guarantee that computers would not be introduced into the home. The Government responds that Mr. David Hollender has already been found to be an inappropriate guarantor of bond for his son, due to his apparent involvement in some of the matters alleged in the indictment—another finding from the June 12, 2001 hearing that does not appear to be challenged by the Second Circuit. If Mr. Hollender cannot be trusted in the posting of bond, the Government argues, he cannot be trusted to keep his word concerning the introduction of computers into the home.

I find the Government's reasoning on the issue of David Hollender persuasive. For the same reason that Judge Fox and I previously found Mr. Hollender to be an unsatisfactory guarantor for his son, I conclude that I cannot rely on his word to keep the home free of computer equipment. In the hearing before Judge Fox, the senior Mr. Hollender admitted to an involvement in certain of the alleged insurance frauds allegedly perpetrated by his son. This casts doubt on his credibility. Perhaps the senior Mr. Hollender's involvement was innocent. Perhaps it was not. At this point, the Government has satisfied me, by a preponderance of the evidence, that there is a serious question about Mr. David Hollender's *bona fides* in connection with the insurance frauds charged in the indictment; and against that background, his word is of far less value than might otherwise be the case.

I find that Pre–Trial Services cannot reasonably ensure that no computer will be brought into the Hollender home. Agent Kowall testified that it would be impossible for Pre–Trial Services to monitor computer usage in the Hollender home, because it would be impossible, short of maintaining 24 hour surveillance, to ensure

that no one was bringing computer equipment into the home. I credit that testimony. Given the size of some of the many internet-accessible devices available on the market today (Palm Pilots, cell phones with internet access, miniature personal computers)—all of which can be carried in a pocket or purse—I can hardly do otherwise. Indeed, the Court questions whether it would be possible to monitor the arrival of computer equipment at the Hollender residence without searching everyone who came to visit. Such a procedure, of course, would be not only impossible, but unconstitutional.[5]

Thus, because Pre–Trial Services cannot reasonably ensure that no computer equipment would be brought into the home, I conclude that the proposed "no computer" condition—while appealing on the surface—does not assure that defendant would be unable to gain access to the equipment necessary to enable him to create false identity documents similar to those found in the computer seized from his office.

In short, I conclude that the Government has established, by a preponderance of the evidence, that no condition or set of conditions is reasonably guaranteed to assure defendant Chaim Hollender's appearance at trial; and I further conclude that, on the record as it stands, Pretrial Services would be unable, short of stationing an agent in the Hollender home, to assure this Court that no computer equipment would be present in the Hollender home. Accordingly, I deny bail.

5. If it were possible for Pre–Trial Services to monitor computer usage in the Hollender home, this concern might be somewhat less. As noted above, I believe that modem usage would interfere with electronic monitoring. However, we have entered the post-modem computer era, so the fact that Pre–Trial Services could detect the use of a modem does not mean that it can detect all computer usage in the Hollender home.