UNITED STATES of America, Plaintiff,

v.

Douglas BERGNER, Russell "Rusty" Prevatte, Robert A. Soy, and Jerry Williams, Defendants.

No. HCR 92–042(4).

United States District Court,
N.D. Indiana,
Hammond Division.

June 10, 1992.

Ronald J. Kurpiers, II, Asst. U.S. Atty., Hammond, Ind., for U.S.

Arlington Foley, Merrillville, Ind., for defendant, Bergner.

James Foster, Hammond, Ind., for defendant, Williams.

David Chidester, Valparaiso, Ind., for defendant, Prevatte.

Robert E. Truitt, Valparaiso, Ind., for defendant, Soy.

## MEMORANDUM OPINION AND ORDER

LOZANO, District Judge.

This matter is before the Court on Defendant, Jerry Williams ("Williams"), Petition for Review of Detention Order, filed April 8, 1992, and Motion to Reopen and/or Reconsider Detention Based Upon New Evidence Now Available for Presentation, filed May 15, 1992. Being advised in the premises, this Court hereby AFFIRMS Magistrate Judge Andrew P. Rodovich's Detention Order in every respect.

### BACKGROUND

The grand jury returned an indictment against Williams on March 18, 1992, alleging that Williams violated 18 U.S.C. § 371, 18 U.S.C. § 844(i), 18 U.S.C. § 2, and 18 U.S.C. § 1505. The indictment alleges that Williams conspired with co-defendants Douglas Bergner ("Bergner"), Russell "Rusty" Prevatte ("Rusty"), and Robert A. Soy ("Soy") to commit a series of pipe bombings in Northwest Indiana from in or about October 1991 to and including in or about February 1992. A warrant was issued for Williams' arrest on March 18, 1992, and at Williams' initial appearance the Government moved for his detention. A detention hearing was conducted on March 20, 23 and 24, 1992, before the Honorable Andrew P. Rodovich, Magistrate Judge for the Northern District of Indiana. At the detention hearing, the Government presented evidence through the testimony of Special Agents Frank Jury and Van Tuley from the Bureau of Alcohol, Tobacco and Firearms ("ATF"), and of Police Officer Fred Behrens of the Hammond Police Department. At the conclusion of the detention hearings, Magistrate Judge Rodovich denied Williams' motion for bond. In connection therewith, Magistrate Judge Rodovich filed a Detention Order on March 31, 1992, detailing his findings of fact and reasoning for detaining Williams. If convicted of all charges alleged in the indictment, Williams faces a maximum sentence of life imprisonment along with twenty years imprisonment.

### DISCUSSION

In Williams' Petition for Review of Detention Order, filed April 8, 1992, Williams asserts that the Government did not sustain its burden of establishing that no condition nor combination of conditions will reasonably assure the safety of the community. Williams also avers that he is entitled to and requests a prompt *de novo* hearing on the issue of detention. In the Government's Response to Defendant's Petition for Review of Detention Order, filed May 11, 1992, the Government maintains that it did sustain its burden by clear and convincing evidence that Williams is a danger to the community and that no condition or combination of conditions will reasonably assure the safety of the community or any potential government witnesses. However, the Government did not address Williams' request for a *de novo* hearing in

this matter. This is of no moment, as a district court may review a magistrate's detention order without a *de novo* hearing. *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir.1987); *see also United States v. Phillips*, 732 F.Supp. 255, 259 (D.Mass. 1990). Moreover, whether to hold a *de novo* hearing, which includes the presentation of evidence already presented to a magistrate or new evidence, rests within the sound discretion of the reviewing judge. *See United States v. Levine*, 770 F.Supp. 460, 464 n. 7 (N.D.Ind.1991); *United States v. Shaker*, 665 F.Supp. 698, 704 n. 8 (N.D.Ind.1987); *see also United States v. Dominguez*, 783 F.2d 702, 708 n. 8 (7th Cir.1986).

On May 15, 1992, Williams filed a Motion to Reopen and/or Reconsider Detention Based Upon New Evidence Now Available for Presentation, again requesting a hearing, due to new evidence available to Williams. At the detention hearing, Agents Jury and Tuley testified as to Williams' other criminal activities based on interviews with Douglas Scott Prevatte ("Prevatte"). Williams claims that since the detention hearing, Prevatte has recanted his declarations to the agents. Further, Williams claims that his co-defendants have declared to others that he had no connection with certain of the Government's acts offered as proof of danger. In William's Superseding Memorandum in Support of Motions Filed, filed May 29, 1992, Williams' Attorney, James E. Foster, represents that four inmates at the Metropolitan Correctional Center ("MCC") have been told by Williams' co-defendants that he had nothing to do with the charged offenses. Presumably, Foster is referring to the conspiracy charge in Count One. Foster asserts that he is in possession of a "short written advisement" from one of the inmates, but did not attach said statement to his Memorandum. Foster admits that he may not be able to obtain an adoptive statement from each of the four MCC inmates, but if given the opportunity, will place these witnesses on the stand to determine "whether or not we have an adopted statement from each."

█ Title 18 § 3145(b) [1] provides for district court review of a magistrate's release or detention order. When reviewing a magistrate's determination, a district court must conduct a *de novo* review and need not defer to the magistrate's findings. *Levine*, 770 F.Supp. at 465. Section 3145 does not provide by statute for a hearing, but as previously noted, it is within this Court's discretion to do so.

█ Generally, a court does not need to have a hearing just because a party asks for one. *United States v. Sophie*, 900 F.2d 1064, 1071 (7th Cir.1990); *United States v. Fountain*, 777 F.2d 351, 358 (7th Cir.1985). "An evidentiary hearing is necessary only if the party requesting the hearing raises a significant disputed factual issue." *Sophie*, 900 F.2d at 1070. Under § 3142(f), a detainee may reapply to the judicial officer who detained him in the first instance under the following circumstances:

> The hearing may be reopened before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community.

Thus, a magistrate may reopen a hearing if a movant alleges that: 1) new evidence has been uncovered that was not known to the movant at the time of the original detention hearing; and 2) the new evidence has material bearing on the issue of whether or not the person is a danger to the community or whether conditions of release will assure the appearance of the person as required. In *United States v. Shaker*, Judge Moody noted that "a strong argument could be

---

1. (b) **Review of Detention Order.**—If a person is ordered detained by a magistrate, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly.

made that in order to be entitled to an oral hearing and to present new evidence under § 3145(b), a defendant should meet the same standard required under the newly amended § 3142(f)." 665 F.Supp. at 704 n. 8. This Court finds Judge Moody's argument persuasive, and holds that in order to be entitled to a hearing under § 3145(b), a defendant must meet the standard as required by § 3142(f).

■ As to Williams' allegation that Prevatte has recanted, Magistrate Judge Rodovich ordered the Government and Williams to provide affidavits in support of their respective positions. The Government has provided this Court with an affidavit of Scott Prevatte stating that he had not recanted nor in any way changed his testimony as to his and the involvement of Williams and his co-defendants in a series of pipe bombings as well as other crimes that occurred in 1991 and 1992. To date, Williams admits that his accusations that Prevatte has recanted are based upon "totem hearsay" and has not provided the Court an affidavit from anyone affirming the fact that Prevatte has recanted. As such, there is no cognizable factual dispute and the Court finds that a hearing is not necessary with regard to this matter.

■ As to Williams' allegation that his co-defendants have declared to four inmates at the MCC that he had no connection to certain charges against him, his attorney, Mr. Foster, has averred that he has a statement of one of the individuals, but has not provided it to the Court. Noting the difficulty of interviewing prospective witnesses at the MCC, Williams requests to examine these four witnesses on the witness stand, without previously interviewing them or knowing the substance of their testimony. This Court respectfully declines defense counsel's invitation to join him in his fishing expedition and will not let its valuable time be wasted in such a manner. With no support other than the representation of his attorney, Williams has not placed a factual issue in dispute. Accordingly, the Court also finds that a hearing is not necessary with respect to this allegation. Moreover, the Court finds that even assuming that these four witnesses testified in a hearing that Williams' co-defendants denied Williams was involved in any wrong-doing, there is clear and convincing evidence that he is a danger to the community and that no set of conditions, short of detention, will protect the community or potential government witnesses.

Upon careful review of the record and transcripts and evidence presented at Williams' detention hearing, this Court hereby makes the following findings of fact:

1. Williams, Alan Simmons ("Simmons"), and Timothy Cunningham ("Cunningham") were probationary officers with the Hammond Police Department. From September 16, 1991, to December 20, 1991, the three officers attended the police academy in Plainfield, Indiana. The training program permitted the officers to return home on weekends, and Williams and Simmons frequently travelled together to and from the academy. On a number of occasions, Williams discussed various criminal activities with Simmons. Simmons has been cooperating with the Bureau of Alcohol, Tobacco & Firearms ("ATF") and has provided ATF agents with information concerning Williams. In Cause No. HCR 92–37, Simmons is charged in a one count information with mail fraud, 18 U.S.C. §§ 1341 and 2.

2. Prevatte is the brother of Rusty. On February 16, 1992, Prevatte and Rusty were arrested after the attempted burglary of Nick's Liquors in Hammond, Indiana. On February 17, 1992, Prevatte began cooperating with ATF agents in their investigation of a series of pipe bombings in Lake County, Indiana. Prevatte also provided information concerning other crimes committed by Bergner, Rusty, Soy, and Williams. In Cause No. HCR 92–41, Prevatte is charged in a one count information with a violation of 18 U.S.C. §§ 844(i) and (2). On March 18, 1992, Prevatte entered into a plea agreement with the Government under which he would receive a maximum sentence of ten years in prison.

3. In December 1991 and January 1992, five pipe bombs exploded in Whiting, Hammond, and Highland, Indiana.

 A. On December 23, 1991, a pipe bomb exploded at 1425 Stanton, Whiting. Emily Antkowicz was in her backyard and was killed by the explosion.

 B. On December 30, 1991, a pipe bomb exploded at Edo's Lounge, 8929 Indianapolis Boulevard, Highland. The bomb was placed near a gas meter and caused extensive damage to the meter.

 C. On December 31, 1991, a pipe bomb exploded at Salvino's Restaurant, 1423 Indianapolis Boulevard, Hammond. Once again, the bomb was placed on a gas meter.

 D. On January 1, 1992, a pipe bomb exploded behind a private residence at 6150 Harrison Avenue, Hammond. The bomb again was placed on a gas meter.

 E. On January 5, 1992, the final pipe bomb exploded behind an apartment building at 1608—169th Street, Hammond. The bomb again was attached to a gas meter.

4. While he was attending the police academy, Williams displayed an interest in explosives. According to Simmons, Williams spent time in the academy library doing research on bombs and gang-related activities. One of the books which Williams reviewed was entitled *Anarchist's Cookbook.* Another book discussed placing a pipe bomb on a gas meter as a diversionary tactic. ATF agents confirmed the information provided by Simmons with the academy librarian. Academy instructors Randy Davis and Bruce Baker also indicated that Williams had questioned them concerning explosives. Williams also informed Simmons that he had made a bottle bomb while he was in high school.

5. On December 23, 1991, Rusty and Soy purchased four pipes and eight end caps from Builder's Square in Hammond. ATF technicians have confirmed that the first four pipe bombs were the same size and make. Rusty and Soy also obtained the other materials used for the pipe bombs and were responsible for their assembly.

Rusty and Soy were responsible for placing the first four bombs, but the fifth and final pipe bomb was placed by Soy alone.

6. The explosions were intended to create a diversion so that Rusty, Soy, Bergner, and Prevatte could commit burglaries. The first pipe bomb was exploded as a test to determine how much damage the bomb would cause and the reaction time of the police agencies. The next three pipe bombs were related to burglary attempts.

 A. After the December 30, 1991, explosion at Edo's Lounge, Rusty, Soy, and Bergner attempted to burglarize the Aldi store in Highland while that investigation was in progress.

 B. In November 1991, Rusty and Soy attempted to burglarize Oasis Liquors in Hammond. An individual who resided in an apartment over Salvino's Restaurant witnessed the attempted burglary, and Rusty and Soy had to flee. The December 31, 1991, bombing at Salvino's was an attempt to frighten the individual who had seen the attempted burglary.

 C. After the January 1, 1992, bombing at 6150 Harrison, Rusty, Soy, and Bergner attempted to burglarize a currency exchange at 165th and Calumet Avenue in Hammond while that investigation was in progress.

 D. Prevatte was not able to provide a motive for the January 5 bombing.

7. After the January 5, 1992, bombing, Williams warned Rusty and Soy that they were suspects in the series of bombings. Williams instructed them to dispose of any evidence relating to the bombings. Rusty, Soy, and Prevatte drove to Canal Street in East Chicago, Indiana and disposed of gun powder, sealant, tape, and fuses. As part of his cooperation, Prevatte took ATF agents to Canal Street, and these items were recovered.

8. As previously stated, Rusty and Prevatte were arrested on February 16 after an attempted burglary. On February 17, Williams visited the two brothers in the Hammond City Jail. Williams again instructed them to dispose of any evidence relating to the bombings.

9. By his own admission, Williams and Rusty have been friends since high school. Additionally, Williams' sister Heidi is the girlfriend of Rusty and the mother of his two-year old daughter.

10. In December, 1991, Williams and Cunningham discussed an insurance scam involving Cunningham's black S–10 Chevrolet pickup. Williams approached Rusty, who agreed to take the vehicle and destroy it so that Cunningham could file an insurance claim. On December 7, 1991, Rusty took possession of the pick-up truck.

11. After informing Rusty, Soy, and Prevatte that they were suspects in the bombings, Williams also provided the defendants with additional information. Williams has admitted that he gave Rusty the frequencies used by the Hammond Police Department so that he could listen to the police department communications on his police scanner. Williams also provided Rusty with the police codes so that he could interpret the discussions. Additionally, Williams has admitted that he provided Rusty and Soy information relating to a February 3, 1992, raid on the Latin Kings street gang. However, this leak did not cause any interference with the raid. According to Prevatte, Williams provided additional information to Rusty. On one occasion, Williams told Rusty that a footprint had been discovered at a burglary and suggested that Rusty dispose of his shoes. Williams also provided Rusty with information, obtained through the Hammond Police Department, on faulty burglar alarms.

12. Williams was interviewed by Agent Jury and admitted to being involved in the following criminal activity:

A. On August 7, 1990, Williams and Rusty stole a jet ski while they were in Florida. Prior to his arrest, Williams permitted agents to search a storage locker which he had in Lansing, Illinois. Agents recovered the stolen jet ski along with a Ninja motorcycle stolen by Rusty.

B. In April 1991, M & G Metals, a scrap metal business located in Hammond, was burglarized. Rusty, Soy, and Bergner committed the burglary, and Williams has admitted that he acted as a lookout. A shotgun and other items were taken in the burglary.

C. Williams also has admitted that he sold the shotgun stolen from M & G Metals to Jerry LaDuke. At the time of the sale, the shotgun was 21 inches long and was considered an illegal sawed-off shotgun. Williams later retrieved the shotgun from LaDuke and changed the barrel to a legal length. After viewing the shotgun, LaDuke acknowledged that the barrel had been changed. This transaction forms the basis of Count 24 of the indictment.

13. Simmons was a confidant of Williams while they attended the police academy. Williams stated to Simmons that he had made pipe bombs in the past with other individuals and was familiar with making a pipe bomb. According to Simmons, Williams also admitted to the following activity:

A. Prior to his employment as a police officer, Williams worked as a security guard at the Wolf Lake Park in Hammond. Williams told Simmons that he and Rusty burglarized the concession stand located at the park.

B. In October, 1991, Williams admitted to Simmons that he had assaulted an individual the previous weekend. According to Williams, the individual had made an obscene gesture to him, so Williams and Rusty beat the individual and took his leather jacket.

C. Williams told Simmons that prior to entering the police academy, he had shot and killed a man.

14. In 1991, Williams was a roommate of his former high school teacher, Steve Sheppard. According to Prevatte, Williams knew that he was the beneficiary of an insurance policy and discussed killing Sheppard with Rusty and Soy. Agent Jury confirmed that Williams had been the beneficiary of a $50,000 insurance policy on the life of Sheppard. In a proffer, Sheppard indicated that he had no knowledge of any plan to kill him and that he did not believe that Williams was a danger to himself or the community.

15. According to Prevatte, Rusty, Soy, Bergner, and Williams have ties to various street gangs. Rusty and Bergner have acted as enforcers for the Northwest Indiana Skin Heads (NISH) and the Latin Kings. According to two confidential police informants, NISH members have attended several parties at Soy's home, and Williams has been observed parked in his vehicle outside of the home on at least three occasions.[2]

Pursuant to the Bail Reform Act of 1984, codified at 18 U.S.C. §§ 3141–3156, this Court may detain a defendant pending trial "if the Government demonstrates by clear and convincing evidence ... that no release conditions 'will reasonably assure ... the safety of any other person and the community.'" *United States v. Salerno*, 481 U.S. 739, 741, 107 S.Ct. 2095, 2098, 95 L.Ed.2d 697 (1987). To make a determination as to whether to detain a defendant without bond, the Court must consider:

1) the nature and circumstances of the offenses charged, including whether the offense is a crime of violence or involves a narcotic drug;

2) the weight of the evidence against the person;

3) the history and characteristics of the person, including: (a) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and (b) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State or local law; and

(4) the nature and seriousness of the danger to any person in the community

that would be posed by the person's release....

18 U.S.C. § 3142(g).

 Based on the above findings of fact (excluding those included by this Court) Magistrate Judge Rodovich found that Williams is a danger to the community and that nothing short of detention will protect the community and any potential government witnesses, and ordered Williams held without bond. This Court is in agreement with Magistrate Judge Rodovich's holding, and finds that even without the information elicited by Prevatte, and taking into consideration the possible favorable testimony of the four inmates at the MCC, Williams is a danger to the community based upon information that Williams, himself, gave to the Government and information the Government received from Simmons.

In reaching this conclusion, this Court must first take into consideration the nature of the offenses that Williams is charged with committing. All of the charges pending against Williams involve or relate to crimes of violence. Williams is charged with conspiring to damage or destroy property by means of a pipe bomb. A total of five pipe bombs exploded in Northwest Indiana, one of which killed Ms. Emily Antkowicz. Williams is also charged with attempting to damage and destroy by means of a pipe bomb, a building in Hammond, Indiana which resulted in the death of Ms. Antkowicz. Williams is further charged with obstruction of justice. This Court finds that the evidence elicited at the hearing corroborates the evidence alleged in the indictment, primarily through the evidence provided to the Government by Prevatte. However, as to dangerousness, Simmons and Williams, himself, have provided ample information which is also corroborated in the indictment. Further, Williams has presented little evidence to contradict the corroborative evidence alleged by the Government.[3]

---

**2.** This Court agrees with and has adopted the findings of fact of Magistrate Judge Rodovich, with the exception of a few minor alterations and additions made by the Court.

**3.** *See* this Court's finding of fact number 14.

This Court must also take into consideration the history and characteristics of Williams. Simmons stated that Williams spent time in the police academy library doing research on bombs and gang-related activities. Williams told Simmons that he had made pipe bombs in the past, as well as a bottle bomb when he was in high school. Williams also told Simmons that he burglarized a concession stand while working as a security guard in Wolf Lake Park in Hammond, Indiana. Williams informed Simmons that he sold a sawed off shotgun to Jerry LaDuke and later altered the barrel to conform to the legal length. Simmons was also told that Williams beat up an individual and took his leather jacket after the individual made an obscene gesture to him. While at the academy, Williams told Simmons that he had killed a man prior to entering the academy. Moreover, Williams, himself, admitted to federal agents that he stole a jet ski while he was in Florida. Williams also told agents that he was involved as a look-out in a burglary of M & G Metals, a scrap metal business located in Hammond. Based on these facts, the Court finds that Williams is a danger to the community.

Lastly, the Court finds that the Government has demonstrated by clear and convincing evidence that no release conditions will reasonably assure the safety of any other person or the community. Williams is implicated in a crime of violence, namely, a conspiracy to set off a series of pipe bombs for personal gain, which resulted in the death of one woman. These pipe bombings continued even after the death of Ms. Antkowicz, which evidences that Williams totally disregarded the value of human life. Williams has also admitted that he recently beat up an individual. Most importantly, Williams has shown little respect for the law, as he allegedly committed these crimes while a Hammond police officer and burglarized a concession stand at Wolf Lake Park while employed there, in a position of trust, as a security guard. This Court is not convinced that if he did not respect the law then, he will do so now.

Accordingly, Magistrate Judge Rodovich's Detention Order is hereby AF-FIRMED, and Williams is hereby ORDERED DETAINED consistent with Magistrate Judge Rodovich's previous Detention Order, filed March 31, 1992.