UNITED STATES of America, Plaintiff,

v.

**Gary J. FLORES, Defendant.**

**No. CR S–94–0162 WBS.**

United States District Court,
E.D. California.

May 16, 1994.

Memorandum and Order Re Motion
to Reopen the Detention Hearing
May 27, 1994.

Miguel Rodriguez, Sacramento, CA, for plaintiff.

Quin Denvir, Sacramento, CA, for defendant.

### MEMORANDUM AND ORDER

HOLLOWS, United States Magistrate Judge.

*Introduction And Summary*

The United States (hereafter "government") has moved for detention of Gary Flores, a defendant in this case which charges a conspiracy to deprive another person of his civil rights. Specifically, Flores, as an alleged member of a local anti-African American gang, "the Brotherhood," is alleged to have participated in a severe battering of an African–American for no apparent reason other than racial animosity. The government sought detention on grounds of flight risk and danger to the community. Due to allegations of threats that Flores had made towards witnesses in this case, the court held an evidentiary hearing on May 4, 1994. The court found at hearing that the government had not shown by a preponderance of the evidence that Flores was a flight risk; that determination was made on the record and will not be discussed further here. However, the court was unsure of its determination on the danger issue at the end of the hearing. The court adjourned the hearing at the close of evidence, but also requested further briefing on a legal issue as well as submission of police reports that had been referenced at the hearing.

For the reasons set forth below, the court orders the defendant to be released to the third party custody of Ernest Flores. The full set of conditions is given at the end of the order.

*Standards for Detention on the Basis Of Danger*

In order to detain the defendant, the government must prove that defendant either poses a flight risk or alternatively that defendant is a danger to the community. Proof of *both* flight risk and danger to the

**1402**

community is unnecessary. *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985). The government must prove danger to the community by clear and convincing evidence. *United States v. Gerbo*, 948 F.2d 1118, 1121 (9th Cir.1991). The court may consider detention of a defendant who is charged with a crime of violence, 18 U.S.C. § 3142(f)(1)(A); it is undisputed that Flores is charged with a crime of violence. However, when a defendant has been charged with a crime that is not presumptive cause for detention under the statute, "[o]nly in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in the defendant's favor." *Id.*

The parties have brought to the court's attention pertinent cases regarding danger to the community. One of the most instructive analyses on "danger to the community" and its affect on the pretrial release decision is *United States v. Tortora*, 922 F.2d 880 (1st Cir.1990). The *Tortora* court held that a district court need only find evidence of an "objectively reasonable assurance of community safety" before release is appropriate for a person described by the government as a danger to the community. The "danger" does not only refer to physical violence, but can apply to any likely conduct that will hurt the community, i.e., continued criminal activity. *Tortora* went on to discuss the factors that were important to it in the "danger" analysis: a defendant's associational ties, his criminal history (indicating the likelihood or lack thereof for future criminal conduct), his penchant for violence. Also important were the nature of the crime for which he had been charged, and the weight of the evidence.[1] *See also, United States v. Patriarca*, 948 F.2d 789 (1st Cir.1991) (organized crime associational ties were important, but were insufficient to require detention of the defendant); *Marino v. Vasquez*, 812 F.2d 499 (9th Cir.1987) (a non-Bail Reform Act case holding that a district court did not err in releasing a prisoner pending adjudication of a *habeas corpus* petition, even though the prisoner was a convicted murderer with several assault incidents in prison [certainly one end of the "dangerousness" spectrum]); *United States v. Graewe*, 689 F.2d 54 (6th Cir.1982) (pre-Bail Reform Act case in which defendant who was an "enforcer" for a narcotics organization on trial for murder and attempted murder of witnesses was held as a danger to the community; although the defendant had made no direct threats to witnesses, he had implied a threat when he told a witness that he had removed the body of a murdered man); *compare, United States v. Shea*, 749 F.Supp. 1162 (D.Mass.1990) (presumption case) (defendant's organizational ties and other evidence of propensity for violence required detention) with *United States v. Digiacomo*, 746 F.Supp. 1176 (D.Mass.1990) (high ranking officials of the Mafia not detained).[2,3]

The court will apply the factors discussed in the above cases.

---

1. However, the Ninth Circuit has consistently reminded the district courts that the weight of the evidence is the least important factor. *Motamedi*, 767 F.2d at 1408. This court is bound by *Motamedi* and will apply it herein.

2. Cases involving defendants on trial for serious drug offenses are only marginally instructive here in that Congress has declared that such defendants are initially presumed to be a danger to the community. *See, United States v. Sazenski*, 806 F.2d 846 (8th Cir.1986) which comes close to the holding that an indictment for a serious drug offense itself establishes a nearly impossible hurdle for a defendant to jump in overcoming the presumption of danger to the community. In between are cases such as *United States v. Warren*, 787 F.2d 1237 (8th Cir.1986) ("presumption" and prior convictions for *use* of firearms and a serious drug charge are sufficient to estab-

lish danger to the community) (*but see,* dissent); *United States v. Daniels*, 772 F.2d 382 (7th Cir. 1985) (the "presumption" and evidence of a good possibility of further drug trafficking sufficient to show danger to the community); *United States v. Hare*, 873 F.2d 796 (5th Cir.1989) (same); *United States v. Freitas*, 602 F.Supp. 1283 (N.D.Cal. 1985) ("presumption" and significant criminal record, along with the defendant's status as an alien, show by clear and convincing evidence that release of the defendant would endanger the community).

3. Flores also relies on *United States v. Ojeda Rios*, 846 F.2d 167 (2nd Cir.1988), in which a member of a Puerto Rican para-military organization was released. However, the release in that case was motivated by the fact that the defendant had already spent 32 months in pretrial detention.

*Discussion*

■ Flores is charged with a crime of violence, also known as a hate crime, and the weight of evidence for that crime is rather high. Flores admitted his involvement to another person in graphic terms; he was identified by eyewitnesses at the scene of the attack. Moreover, Flores has demonstrated a consciousness of guilt by attempting to derail the investigation by the giving of arguably false information to the FBI. The court has made a necessarily rough Guidelines computation of the potential sentence if Flores is convicted—it would range from a year to a little over two years, assuming no departures and a criminal history category of I or II. For reasons unknown to the undersigned, hate crimes in which personal injuries are involved are not given heavy penalties under the present scheme. The nature of the potential penalty favors Flores. However, it is not the function of this court to "sentence" Flores prior to his trial. The only pertinence of the nature of the charged crime and the weight of the evidence is its utilization to predict what the future conduct of the defendant might be if released pretrial. On balance, the nature of the crime and the weight of the evidence favor the government's case for detention, but this fact is not dispositive of the detention question.

In determining the propensity of the defendant to be a danger to the community upon pretrial release, the court was highly interested in other acts of violence attributed to Flores, his past criminal record of any kind, past acts of violence or racial hatred attributed to members of the "Brotherhood," and the capacity of Flores, or others on his behalf, to intimidate witnesses. The court was not significantly interested in the past acts of violence attributed to Flores' associates that were not related to gang activities. Although the government has introduced some evidence in all of the above areas, it is simply not clear and convincing at this point that there are no conditions or combination of conditions that will reasonably assure the safety of the community.

Flores has apparently been physically abusive to his girlfriend in the past (the "head-butt" incident). Flores also has a past misdemeanor conviction for assault as well as several arrests or initial complaints (no convictions) for other incidents of less than serious (relatively speaking) violence. Although the government initially trumpeted the fact that Flores was involved in a "murder" (something obviously quite serious), the only evidence on this issue (Government Appendix 150) suggests at best that Flores was the victim of aggression in which he defended himself.[4] While it is true that nearly any assault will be perceived as serious to the victim involved, in order to perform any accurate analysis of Flores' propensity to be a danger to the community on account of assaultive behavior, it is necessary to categorize the incidents of past violence. Murder and debilitating injuries caused by acts of violence are serious; assaults motivated by racial animosity are serious; it cannot be said that every other assault or fist fight causing relatively minor injury is "serious." Although the government has shown that defendant will engage in assaultive behavior (especially when the odds are in his favor), the government has engaged in some hyperbole concerning the past acts of Flores. The point here is whether there are any conditions or combinations of conditions that the court can impose to deter the violent tendencies of this particular defendant *as shown by the evidence.*

The remainder of Flores' past criminal record involves a forgery conviction which is not indicative of pretrial release danger to the community.

The government also proffered that Flores had made threats to potential witnesses in this case. The evidence at hearing revealed that Flores' ex-girlfriend had been told by Flores to tell the FBI some untruths about Flores' whereabouts/activities, and that the girlfriend felt threatened at this point because of her previous knowledge of Flores'

**4.** Counsel for Flores contends that the entire "murder" allegation was a fabrication made up by Flores to impress his girlfriend. If so, the court has some question about the mental stability of the defendant. The sum total of evidence on this killing leaves great doubt that any killing took place at all.

assaultive behavior towards her and gang social dynamics. This evidence came by way of multiple level hearsay. There was no evidence of a direct threat made by Flores. The court is concerned that Flores may have attempted to obstruct justice here; however, the quality of evidence presented in court does not clearly weigh in favor of detention.

The so-called Brotherhood is not an organized gang as such, but rather a somewhat loose association of approximately 15 individuals who espouse white supremacy. In other times, the gang members would be described as neighborhood punks who ensure that the odds are in their favor before they engage in assaultive behavior. The evidence at hearing also demonstrated that the Brotherhood has lost many of its "brothers" at this time. The evidence further showed that the Brotherhood associates of Flores, namely Jordan, Baird and Phillips had engaged in violent acts in the past. Indeed, Baird and Phillips on April 5, 1992, had participated in another assaultive hate crime. However, Flores was not involved in that crime, and the government had no reliable information concerning the length of time that Flores had been an active member of the gang. The evidence showed more serious potential for violent acts regarding these three associates/co-defendants than for Flores, including threats made to witnesses in this action; however, a good deal of the past violent behavior of these three co-defendants were not directly linked to activities of the gang.[5]

The above cases do instruct that associational ties of a particular defendant may be an important predictor of an individual's propensity for further violence; however, the type of gang involved here, and the violent acts alleged, pale in comparison with those described in the case law above. Although the issue is not free from all doubt, given the nature of the Brotherhood gang, Flores' associational ties do not clearly indicate that he will join in future witness intimidation or other racial crimes if released prior to trial. At least the court can fashion conditions that

would appear capable of thwarting such behavior.

Also, a factor in the resolution here is the length of time between the May 14, 1993, incident at issue, and the first formal federal charge in this case—the indictment dated April 28, 1994. At least some of the suspects in the attack were known soon after the attack; the eyewitnesses had given their story. Certainly all of the defendants were known to the federal government at the beginning of this year. There seemed to be little in the way of precluding a complaint and an arrest warrant at least at that time. The point of the court's observation is not to chide the FBI for making a complete investigation, but rather to note that if all the defendants in this case were considered such a danger to the community, the government did not seem overly concerned about the fact that they apparently were out in the community for months before being taken into custody.

On balance, the government has not demonstrated by clear and convincing evidence that there are no conditions or combination of conditions that the court can fashion which will reasonably assure the safety of the community upon pretrial release of defendant Flores. The court has fashioned the conditions listed below.

*Conditions*

1. A bond in the amount of $25,000.00 will be posted. The bond will be secured by defendant Flores' grandfather's home (Roy Flores). All paperwork in connection with the bond shall be filed no later than May 23, 1994. Flores' counsel shall give government counsel the opportunity to review the paperwork as to form.

2. Flores shall have no contact of any type with any potential government witness to this criminal case. Potential witnesses include the girlfriend referenced in this Order. Except for contact by his attorney, or at the direction of his attorney, Flores shall not cause any person to have contact with a

---

**5.** The government suggested that the Brotherhood had a "rat and die" code; however, the only evidence on this issue, Appendix at 104, is not very persuasive of this fact, in and of itself.

The evidence at hearing demonstrated that several members of the Brotherhood have given information to the FBI in connection with this case.

potential government witness to this case.[6] In addition, Flores shall have no personal contact with any present or past member of the Brotherhood, including his co-defendants.

3. Flores shall not enter the Lichen neighborhood, adjacent to the 7–11 shopping facility, without prior approval of the Pretrial Services Officer.

4. Flores shall not possess, or have access to, a firearm of any type. Flores shall certify to the Pretrial Services officer assigned to his case that his residence while out on pretrial release, *see below*, contains no firearms.

5. Flores shall refrain from excessive use of alcohol, or the use of a narcotic drug or other controlled substance without a prescription by a licensed medical practitioner; Flores shall report any such prescriptions to the Pretrial Service Officer; Flores shall also submit to urinalysis testing at the discretion of the Pretrial Services Officer.

6. Flores shall maintain employment, or if unemployed, shall actively seek employment.

7. Flores shall report to the third party custody of Ernest Flores. While in third party custody, Flores shall reside at the residence of Ernest Flores, 8410 East Granite Drive, Granite Bay, California, and not absent himself for more than 24 hours without the approval of the Pretrial Services Officer.

8. Flores shall not travel outside of the Eastern District of California.

9. Flores shall report to Pretrial Services in person on his first working day following release, and shall abide by the rules and regulations of the Pretrial Services Agency.

10. Prior to being released, Flores shall read and sign the "Notice to Defendant Being Released."

IT IS SO ORDERED.

### MEMORANDUM AND ORDER RE: MOTION TO REOPEN THE DETENTION HEARING

Apparently stung by the court's decision that the government failed to prove by clear and convincing evidence that Flores was a danger to the community if released pretrial, the government has moved to reopen the detention hearing, and has proffered evidence which it suggests was not known to it at the time of the initial hearing. The government's motion to reopen raises two issues: the standards upon which a detention decision may be reopened, and whether the government's "new" evidence concerning Flores' potential to be a danger to the community if released rises to a clear and convincing level.

### A. Standards That Must Be Met Before A Detention Decision Is Reopened

The government maintains that it may move to reopen a detention hearing whenever it has acquired evidence that it did not possess at the initial detention hearing—regardless of the reason that it did not possess the evidence in time to initially present it. The court disagrees. Basic notions of fairness work to preclude the reopening of a judicial detention/release decision unless the party can demonstrate, at the least, good cause for the failure to initially present the evidence.

The Bail Reform Act of 1984 provides that a pretrial detention decision may be reopened "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure ... the safety of any other person and the community." 18 U.S.C. § 3142(f). The government's position that this statutory provision gives the movant carte blanche to reopen the hearing if the movant, through lack of reasonable diligence, failed to acquire information which it could readily have obtained for the initial hearing, is simplistic at best. The statutory language begs the issue here which is—*why* was the information not known to the government at the time of the initial hearing, and will *any* reason given for the lack of

---

6. Of course, to the extent that Flores' immediate family could be considered a potential government witness, this order does not go so far as to preclude contact with immediate family members.

knowledge mandate the reopening of a detention/release decision.

There is no case law to the undersigned's knowledge that directly discusses the issue herein, and there is no legislative history addressing the statutory silence. *See,* e.g., Senate Report No. 98–225, 4 U.S.Code Cong. and Admin. News, 98th Congress, 3182, 3204–05. Two circuit court cases have nibbled around the issue, but fall short of clarifying this point. *United States v. Peralta,* 849 F.2d 625, 626–627 (D.C.Cir.1988), affirmed a district court decision to reopen a hearing and detain a defendant on the basis of information not available at the initial hearing, to wit, the denial of a suppression motion which increased the likelihood of conviction. Clearly, the suppression motion decision could not have been apparent at the time of the initial hearing and was by definition new evidence. The case is not instructive on the issue here.

Similarly, *United States v. Hare,* 873 F.2d 796 (5th Cir.1989), did not directly grapple with the issue. In that case, the defendant moved to reopen a detention decision based on family members testifying as to his "flight worthiness," the fact that he had been a model prisoner while detained, and finally, that his trial would be delayed. The circuit court concluded that the family testimony was not "new," but it did not discuss why. Inferentially, however, it was apparent that the defendant could probably have presented this information at the initial hearing.

The government relied heavily on a treatise concerning the Bail Reform Act written by a respected magistrate judge (John Weinberg) in which he states that: "It is only necessary to show that the information was not 'known' to the movant. It is not relevant that the movant could have, or even should have, known the information at the time of the hearing." Weinberg, *Federal Bail and Detention Handbook,* § 7.09, (1988 & Supp. 1991). However, no authority of any kind is

referenced, and this court disagrees with the conclusion of the author. The court does so for several reasons.

■ There are very few proceedings in federal practice which encourage a party to be less than diligent in bringing forth all material evidence the first time a hearing is held. Generally, reconsideration of a decided matter based on the presentation of additional evidence requires good cause for the failure to present that evidence initially. *See,* e.g., Fed.R.Civ.P. 60(b); *United States v. Oliver,* 683 F.2d 224 (7th Cir.1982) (failure to exercise diligence in locating witnesses before criminal trial precludes new trial based on newly discovered evidence). A rule that would not discourage a party for failing to acquire readily available evidence for presentation the first time is a rule that encourages piecemeal presentations. Judicial efficiency is not served by such a practice.

■ Moreover, detention hearings are an important part of criminal proceedings. It is significant to a defendant when the court orders that he or she spend all pretrial time incarcerated—time that ranges from four months to several years depending on the complexity and events of the case. *See, e.g., United States v. Rocco Infelise,* 934 F.2d 103 (7th Cir.1991); *United States v. Gelfuso,* 838 F.2d 358 (9th Cir.1988); *United States v. Melendez–Carrion,* 820 F.2d 56 (2d Cir.1987). Motions on the part of the government to detain a person pending trial should be viewed as a serious matter. Therefore, when the government makes repeated motions for detention because it has initially failed to present evidence that was readily obtainable, the process appears "stacked" or "rigged." The government should not be allowed to schedule seriatim hearings for detention until it "gets it right." [1]

Finally, detention hearings create considerable expense for the defendant both in terms of resources and emotional stress. In

---

1. Nor could the government argue that because it is entitled to *de novo* review of a magistrate judge detention decision, it could present any evidence it wished at the district court hearing. Firstly, the government is entitled to *de novo* review of a magistrate judge's determination, not necessarily a *de novo hearing. United States v.*

*Raddatz,* 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Secondly, the district judge should not hear new evidence at a detention hearing that does not qualify under 18 U.S.C. 3142(f). *United States v. Bergner,* 800 F.Supp. 659, 661–662 (N.D.Ind.1992).

the event that counsel is appointed for the defendant, the taxpayer is made to pay double for the non-diligence of the government in failing to acquire and present readily obtainable evidence for the first hearing.

The facts of this case demonstrate the above points well, with respect to certain of the evidence that the government desired to proffer. Flores' involvement in the alleged crime was known to the government in January of 1994. No complaint was sought; the government continued to investigate the case until it was ready to indict at the end of April. Surely, the government knew it was going to seek detention in this matter; indeed, it urgently did so at Flores' initial appearance. The government had the opportunity to marshal its evidence for detention long before the arrest of this defendant. Not only did the government have this period of time, but it requested a continuance at Flores' initial appearance so that it could gather still more evidence pertinent to its detention request. At that initial appearance, the government was advised by the court that it was not usually impressed by multiple level hearsay concerning threats that a defendant was alleged to have made, i.e., bring in the persons that have been allegedly threatened. This is not the case where the government was rushed into arresting the defendant, and simply did not have enough time to develop its detention facts.

Yet, the government gave no legitimate reason why some of the past act evidence at the reopened hearing, held a scant week after the initial hearing, was not available for the initial hearing. The government either greatly misjudged the type of evidence required to detain a defendant as a danger to the community (despite this court's advisement on the matter at the initial appearance), or the government really does believe it can have as many bites at the detention apple as it deems fit.[2] Neither misconception should be encouraged by a rule that permits the reopening of a detention decision based on new facts that easily could have been presented at the initial hearing.

▪▪▪ The court ruled at the reopened hearing, therefore, that with respect to witnesses proffered at the later hearing, for whom the government had a significant opportunity to interview concerning Flores' past acts prior to the initial hearing (Jeff and Christi Darby), the government had failed to present good cause for the belated introduction of their evidence. The Darby supplemental evidence was stricken.[3] However, the remainder of the witness testimony presented at the reopened hearing was more or less recently or fortuitously developed by the government upon further investigation after the initial hearing. The FBI agent was quite candid in testifying that he probably could have developed the later acquired information initially had he thought about the issue more deeply; however, the court will not impose a good cause requirement of such strictness that all potential leads need be exhausted prior to the initial hearing. Only those leads which are, or should be, obvious need be exhausted.

### B. The Additional Evidence

▪▪▪ As is evident from the initial order, although the government did not meet its

---

2. The government's explanations to the court on the delay in obtaining some of the readily obtainable evidence were not persuasive. The government argued that it sought to protect the identity of witnesses, and that is why the witnesses were not present at the initial hearing. However, the witnesses were already well known to Flores and all associated with this case. The government also argued that it did not have the opportunity to question witnesses with respect to the detention issues. However, the government had interviewed several witnesses on the past acts of Flores, but chose not to ask the right questions or divulge the information it had at the initial hearing.

3. Only Jeff Darby testified, and this testimony was stricken. In recognition of the court's statements on the matter at the reopened hearing, the government did not present Christi Darby for testimony. The evidence that was not presented was material. Although the striking/preclusion of this testimony and evidence is not fatal to the government's case—this time—the government should know that the court will not hesitate to strike all evidence proffered at a second hearing for which there is not good cause for its belated presentation. However, the court did permit evidence and threats by other belatedly discovered witnesses concerning injuries suffered by Christi Darby.

danger to the community showing by clear and convincing evidence, it did not miss it by a mile either. The nature of the crime and the weight of the evidence favored the government's position. The court was troubled by the ambiguous obstruction of justice alleged against Flores. Flores also had a somewhat developed, but not clear and convincing, record of past violence. On balance, the court found that the government had not met its burden of demonstrating that no conditions or combination of conditions could reasonably assure the safety of the community if Flores were released.

New evidence of several incidents of assaultive conduct were introduced, including evidence of racially motivated assaults. The evidence was uncontroverted.[4] Flores' former apartment manager (Holly Burke) testified that Flores had assaulted her on three different occasions; the assaults included Flores chasing her, telling her that he was going to get her, and at one point, attempting to throw a ten pound rock at her that missed due to the intervention of a friend of Flores.

Most impressive to the court was testimony by Nielsen (a friend of Christi Darby), and the apartment manager, to the apparent series of continuous beatings administered to Christi Darby by Flores.[5] Darby was generally always seen with bruises; Nielsen heard "body-thumping" noises which she interpreted as Darby being thrown against the apartment wall. The apartment manager testified to Darby's appearance and complaints after the beatings. The head-butt incident referenced in the initial order resulted in a concussion to Darby. Darby was pregnant throughout much of the time that she received beatings; she finally miscarried.[6]

When Darby decided that she had been through enough with Flores, and was seeking various apartments within the complex where she could temporarily reside, Flores wrote a note to Darby stating that unless she paid him the money she (supposedly) owed him, "she was dead."

The apartment manager also testified that Flores was seen on at least three occasions walking around the apartment complex late at night carrying a partially concealed firearm. Nielsen testified to an omnipresent hunting type knife carried by Flores.

Finally, the evidence revealed at the rehearing that, during the short period of time that Flores had been released, he had violated this court's written order that he not contact any potential government witness. Flores had been called by a witness subpoenaed for the rehearing, Bates, a former acquaintance of Flores. Flores went to his residence and talked about the substance of the case.[7] Flores also had contact with a "friendly" grand jury witness. However, the court order did not differentiate between supposed friendly witnesses and adversarial witnesses. The court order precluded contact with all witnesses. It was apparent to the court that Flores' contact with Bates had significantly affected Bates' testimony. These violations significantly detract from this court's prior confidence that conditions could be fashioned that would assist in protecting the safety of the community.

■ Past acts of a defendant are a valid basis with which to predict future conduct. When the new evidence is viewed alongside that evidence which was presented at the

---

4. A security guard at a shopping mall frequented by the defendant testified that Flores and an associate purposefully instigated a fight with a black person—the fight was broken up by the security guard before any hitting occurred. Further evidence was received about an assault involving Flores and an "Oriental" person. While the evidence about this assault was not definitive about who started what, when viewed alongside the charges in this case, the court began to see a continuous pattern here.

5. Although the court precluded the government from calling Darby, the court gave Flores' counsel the opportunity to question Darby, if counsel believed she had some information favorable to

Flores' case. Defense counsel declined the invitation.

6. No medical evidence was presented which established a definitive link between the beatings and the miscarriage. In any event, the court can infer that the beatings did not help the situation.

7. The evidence also showed that defense counsel had, after this initial contact, asked his client to contact Bates in order that Bates be interviewed by counsel prior to the hearing. The court is not basing its decision herein on this unfortunate lapse by defense counsel.

initial hearing, including the nature of the charge and the weight of the evidence, the court concludes that the government has now met its burden of showing that there are no conditions or combination of conditions that would reasonably assure the safety of the community if Flores were released pretrial.

The court's oral order at re-hearing detaining Flores is confirmed.

IT IS SO ORDERED.