**UNITED STATES of America,
Plaintiff,**

v.

**John David WARD, et al., Defendants.**

**No. SACR 99–77 GLT.**

United States District Court,
C.D. California,
Southern Division.

July 12, 1999.

---

James Spertus, Assist. U.S. Atty, for U.S.

Brian O'Neill, O'Neill, Lysaght & Sun, Santa Monica, CA, Michael A. Molfetta, Tustin, CA, for defendants.

MEMORANDUM AND ORDER RE: DEFENDANT BRYAN RAY KAZARIAN'S APPLICATION FOR REVIEW OF ORDER OF DETENTION PENDING TRIAL

NAKAZATO, United States Magistrate Judge.

## I. INTRODUCTION

Before the Court is defendant Bryan Ray Kazarian's ("Kazarian") application

for review ("Application") of the magistrate judge's order of June 7, 1999, denying his release and imposing detention pursuant to 18 U.S.C. § 3142(e) ("Detention Order"). On Monday, June 28, 1999, Kazarian's Application came on for hearing before Magistrate Judge Arthur Nakazato after being referred by Judge Gary L. Taylor. Assistant United States Attorney James Spertus appeared for the United States of America (the "Government"). Brian O'Neill of O'Neill, Lysaght & Sun, and Michael A. Molfetta appeared for Kazarian, who was also present and in custody.

After considering the parties' respective proffers and arguments, the Application was taken under submission and, for the reasons explained below, the magistrate judge makes the following findings and conclusions, and issues the rulings set forth at the end of this Memorandum and Order.

## II. *BACKGROUND*

On Sunday, June 6, 1999, Kazarian, an Orange County deputy district attorney, was arrested and charged with conspiring to manufacture, distribute, and possess with the intent to distribute, more than one kilogram of a substance containing methamphetamine in violation of 21 U.S.C. §§ 846 & 841(a)(1).

On Monday, June 7, 1999, Kazarian made his initial appearance before the magistrate judge. After being arraigned, the Government moved for detention on the grounds that Kazarian was both a danger to the community and a flight risk.

In support of its request for detention, the Government proffered there was probable cause to find that Kazarian used his position as an Orange County deputy district attorney to further the alleged drug conspiracy by acting as an informant for co-defendant John David Ward ("Ward"), the conspiracy's alleged ringleader [Complaint, Affidavit, ¶ 16].[1] Specifically, the Government's proffer established that Kazarian furthered Ward's methamphetamine operation by, among other things:

(1) providing Ward with information he obtained from reviewing confidential law enforcement investigatory papers concerning the search of co-defendant Peter Tristen Perry's home and related arrest for possessing 106 pounds of ephedrine [2] [*Id.*, ¶ 35(c) ], information that included (a) the identity of a police investigator involved in the search of Perry's residence [*Id.*, ¶ 55] and (b) the existence of a "Confidential Informant" ("CI") who was ostensibly furnishing law enforcement with information that led to the search of Perry's residence and his arrest (in reality, the CI was a non-existent person whom the FBI created and identified in a fictitious search warrant affidavit provided to Kazarian for the express purpose of verifying whether he was actually passing confidential information to Ward) [*Id.*, ¶¶ 35–36, 40–82];

---

1. The Government's proffer included its complaint, which is supported by the affidavit of FBI Special Agent George W. Clarke, Jr. ("Affidavit"), as well as the Pre–Trial Services Report. The Complaint's supporting Affidavit is 166 pages long and the key charging allegations against Kazarian are set forth in paragraphs 40 through 82; they include excerpts and summaries of intercepted communications between Kazarian and Ward obtained pursuant to Court authorized Title III wiretaps, as well as FBI and law enforcement surveillance reports of meetings between Kazarian and Ward.

2. Ephedrine is a key ingredient or precursor used to make methamphetamine [Complaint, ¶ 36(d) ]; *United States v. Kim,* 176 F.3d 1126, 1127–28 (9th Cir.1999); *United States v. Hudson,* 100 F.3d 1409, 1412 (9th Cir.1996), *cert. denied,* —— U.S. ——, 118 S.Ct. 353, 139 L.Ed.2d 274 (1997). According to the Government, 106 pounds of ephedrine would "yield conservatively in excess of 95 pounds of pure methamphetamine" [Complaint, Affidavit ¶ 36(d) ].

(2) advising Ward "not to put the money into [his] bank account, but to put the money instead into a safe deposit box to prevent the government from finding out about it" [id., ¶ 41]; and

(3) accessing DMV motor vehicles records from terminals located within the Costa Mesa Police Department and the Orange County District Attorney's Office in response to Ward's request to "run a license plate for one of J. Ward's vehicles to see if the vehicle was reported stolen" [id.].

The Government proffered that Kazarian, if convicted, is facing a sentencing range of 292 to 365 months; that is, 24.33 years to 30.41 years. Kazarian is 35 years old.

Kazarian's opposing proffer consisted of efforts to explain, rationalize, or downplay the significance of some of his alleged actions, and that his parents and some relatives would post property to secure his release.

After considering the parties' respective proffers and the oral arguments of counsel[3], the magistrate judge granted the Government's request for detention after finding that the Government had met its burden of establishing that Kazarian was a danger to the community and a flight risk, and that he also failed to rebut the statutory presumption of the same as required by 18 U.S.C. § 3142(e) [Detention Order, IV(D) at 3:14–16].

Meanwhile, on June 17, 1999, Kazarian was indicted by a federal grand jury that found probable cause to charge him with conspiring with Ward, Perry, and five other persons to manufacture and distribute methamphetamine in violation of 21 U.S.C. §§ 846 & 841(a)(1) [Indictment, Count One, at 2:1–12:12]. In Count One of the Indictment, the grand jury charges that "KAZARIAN, a Deputy District Attorney for the Orange County District Attorney's Office, would gather information regarding law enforcement's knowledge of and ef-

forts to investigate defendant WARD and his associates, and would provide that information to WARD" [Id., Section B, ¶ 7 thereof at 4:21–25]. The Indictment chronicles six separate instances where Kazarian allegedly provided information to Ward, in response to Ward's request, concerning the search of Perry's residence and his related arrest for possessing 106 pounds of ephedrine. Further, the Indictment specifically charges that:

41. On or about May 29, 1999, from Aliso Viejo, California, defendant KAZARIAN called defendant WARD and told him that a confidential informant provided information to law enforcement officers, which information was used to obtain a search warrant for the search of defendant PERRY'S residence on February 15, 1999.

[Id., ¶ 41 at 12:1–6].

On June 25, 1999, Kazarian filed his Application seeking a review of the Detention Order and seeking his release on the grounds that his "immediate family is ready to post upwards of $1 million in real property to secure his appearance." [Id.]

## III. *DISCUSSION*

### A. *Standard For Reconsidering Detention Order*

■ A detention hearing may only be reopened "if the judicial officer finds that information exists that was not known to the movant at the time of the hearing," and that information "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). Courts have interpreted this provision strictly, holding that hearings should not be reopened if the evidence was available at the time of the initial hearing. *See United States v. Dillon*, 938 F.2d 1412, 1415 (1st

---

3. Kazarian's present counsel of record did not represent him at the June 7 proceedings.

Cir.1991) (per curiam) (affirming district court's refusal to reopen hearing where defendant's evidence consisted of affidavits and letters from people who knew him attesting to his likelihood of appearing and non-dangerousness; "this information was available to appellant at the time of the [original] hearing"); *United States v. Hare*, 873 F.2d 796, 799 (5th Cir.1989) (affirming refusal to reopen hearing because "testimony of Hare's family and friends is not new evidence"); *United States v. Flores*, 856 F.Supp. 1400, 1405–07 (E.D.Cal.1994) (striking testimony of certain Government witnesses given at reopened detention hearing where the government had a significant opportunity to interview them before the hearing and failed to present good cause for delay).

■ As noted above, Kazarian's pending Application is made on the specific ground that his "immediate family" is ready to post "upwards of one million dollars of real property" to secure his release and appearance [Application at 1].

Kazarian's wife, parents, and his sister and her husband were present at both of the June 7 and 28 hearings, but several of his relatives that are willing to act as sureties did not attend the June 7 hearing. Although his immediate family and relatives were obviously known to Kazarian when he was arrested on Sunday, June 6, the magistrate judge presumes that he had a difficult time contacting all of his potential bail resources immediately after his arrest, and that it was equally difficult for him to secure their attendance at his June 7 initial appearance on such short notice. Further, unlike the other defendants who were arrested on June 6 in connection with the methamphetamine conspiracy, Kazarian did not request a continuance of his bail hearing. Accordingly, the magistrate judge finds the full extent of Kazarian's potential sureties was not fully known and available to him on June 7. Also, the collateral that Kazarian's immediate family and relatives are offering to secure an appear-

ance bond for his release does have a material bearing on whether there is a condition of release that will reasonably assure his appearance at trial.

Therefore, Kazarian's Application is granted to the extent it requests the Court to reopen the detention hearing and review the June 7 Detention Order.

### B. *Reconsideration of the Merits*

■ The Bail Reform Act of 1984 ("1984 Act"), 18 U.S.C. §§ 3141, *et seq.* ("Section 3142"), mandates the release of a person facing trial unless no condition, or combination of conditions, will "reasonably assure" the appearance of the person as required and the safety of the community. Section 3142(c)(2); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir.1991); *United States v. Motamedi*, 767 F.2d 1403, 1405 (9th Cir.1985). Only in rare circumstances should release be denied, and doubts regarding the propriety of release should be resolved in favor of release. *Gebro*, 948 F.2d at 1121; *Motamedi*, 767 F.2d at 1405.

Section 3142 of the 1984 Act contains the following four concepts that are applicable in evaluating whether there are any conditions of release that will "reasonably assure" a defendant's future appearances.

### 1. *The Section 3142(g) factors*

Neither Section 3142 nor any other section of the 1984 Act specifically defines "reasonably assure." However, Section 3142(g) states that, in "determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person in the community," the court must "take into account the available information concerning" the following four factors:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug [4];

4. Ephedrine and methamphetamine fall with-        in the definition of a "stimulant substance"

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community should the person be released.

The factors set forth in Section 3142(g) help shed some light on the meaning of "reasonably assure"; however, Section 3142(g) does not rank or explain how much weight should be accorded to each of its listed factors. *United States v. Jessup*, 757 F.2d 378, 384 (1st Cir.1985)[5]. Nonetheless, the Ninth Circuit has consistently held that, of the four Section 3142(g) factors, the weight of the evidence against the defendant is the least important. *Gebro*, 948 F.2d at 1121; *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir.1986); *Motamedi*, 767 F.2d at 1408.[6]

Separate and apart from the issue of weight, Section 3142(g) does not explain or describe whether a particular factor or specific piece of information, either by itself or in the context of other factors, is or should be construed as favoring release or detention. This statutory silence is not helpful, particularly given that a certain factor or type of information, either standing alone or in the context of others, might be construed as favoring release in some cases but not in others.[7]

Further, while Section 3142(g) requires the court to consider the nature of the offense and evidence of guilt, it does not require or permit a pretrial determination of guilt; "evidence of guilt is relevant only in terms of the likelihood that the person will fail to appear or will pose a danger to the community." *Winsor*, 785 F.2d at 757. "Nothing in [Section 3142] should be construed as modifying or limiting the presumption of innocence." Section 3142(j). But the nature of the charged crime and the weight of the evidence are helpful aids in predicting a defendant's future conduct if released. *United States v. Flores*, 856 F.Supp. 1400, 1402 (E.D.Cal.1994).

---

rather than a narcotic drug. *See* 21 U.S.C. § 802(9)(B) & (17).

**5.** However, as Circuit Judge (now Associate Justice) Breyer noted in *Jessup*, "[i]t is not unusual for Congress to instruct a magistrate [judge] or judge conscientiously to weigh several different factors without specifying precise weights for each." *Jessup*, 757 F.2d at 384.

**6.** *Motamedi*, is the seminal Ninth Circuit opinion holding that the weight of the evidence is the least important factor set forth in Section 3142(g) of the 1984 Act. However, *Motamedi* cites *United States v. Honeyman*, 470 F.2d 473, 474 (9th Cir.1972), as its sole authority for this proposition. *Honeyman* is a pre–1984 Act case where the *Honeyman* panel opined, without citing any authority, "[w]e think that the least weight should be given to

the weight of the evidence against the accused." *Honeyman*, 470 F.2d at 474.

**7.** Take, for example, a defendant's prior criminal history and community ties. In some cases, a defendant with a prior, nonviolent criminal history, who is not a longtime resident with few ties to the community, may still be considered a good bail candidate where the defendant's past history demonstrates the defendant always made every court appearance while previously released even though the defendant was facing a substantial prison sentence if convicted. In contrast, a defendant without any prior criminal history, who is also a lifelong resident but is charged with a very serious offense and is facing a substantial sentence if convicted, may not be considered a good candidate, particularly if there are other factors or information indicating the defendant is likely to be a flight risk.

### 2. Section 3142(e)'s Rebuttal Presumption

Section 3142(e) contains a rebuttal presumption. If the presumption is applicable, it is presumed no condition, or combination of conditions, exists that will reasonably assure the appearance of the person and safety of the community.

█ The rebuttal presumption is triggered where "the judicial officer finds there is probable cause to believe the defendant committed an offense for which a maximum term of imprisonment of ten years or more is prescribed" in one of four, specific statutory groups of offenses involving drugs or certain violent crimes that are identified in Section 3142(e). Violations of the Controlled Substances Act ("CSA"), 21 U.S.C. §§ 801, et seq., fall within one of the four listed offense groups in Section 3142(e). Under the CSA, conspiring to make or distribute more than one kilogram of methamphetamine (or one of its precursors such as ephedrine)—for which Kazarian has been indicted—is a prescribed CSA offense carrying a term of imprisonment of not less than ten years or more than life ("CSA Offense"). 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) & 846. Accordingly, if a judicial officer finds there is probable cause to believe a defendant has committed a CSA Offense, the Section 3142(e) presumption is triggered. Various circuits have uniformly held that a judicial officer does not have to make an independent determination of probable cause; a grand jury indictment itself is sufficient to establish probable cause for purposes of invoking the Section 3142(e) presumption. *Dillon*, 938 F.2d at 1416 (1st Cir.); *United States v. Dominguez*, 783 F.2d 702, 706 n. 7 (7th Cir.1986); *United States v. Hurtado*, 779 F.2d 1467, 1479 (11th Cir.1985), *reh'g denied*, 788 F.2d 1570 (11th Cir. 1986); *United States v. Contreras*, 776 F.2d 51, 52 (2d Cir.1985); *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir.1985); *United States v. Suppa*, 799 F.2d 115, 119 (3d Cir.1986).

In enacting the 1984 Act, "Congress did not precisely describe just how a magistrate [judge] [must] weigh the [Section 3142(e) ] presumption, along with (or against) other § 3142(g) factors." *Jessup*, 757 F.2d at 378. Moreover, the Ninth Circuit does not yet appear to have defined the evidentiary effect of the Section 3142(e)'s rebuttal presumption in any reported opinion.

In *Jessup*, then Circuit Judge Breyer analyzed "what the rebuttable presumption means[,]" and he found it imposed a "burden of production," not a burden of persuasion, the latter of which remains with the government. *Jessup*, 757 F.2d at 381–384, 389. However, he also concluded that, once the defendant offers some rebuttal evidence, the presumption of flight or danger does not burst or disappear; instead, the presumption retains evidentiary weight, and "the precise weight to be given the presumption" is a matter that the judicial officer is to consider "within the framework of factors set out in § 3142(g)." *Id.* at 387.

*Jessup* is considered the leading authority regarding the effect of Section 3142(e)'s rebuttal presumption, and its holding construing the presumption as a non-bursting, rebuttal presumption that only shifts the burden of production onto a defendant, not the burden of persuasion, has been adopted by various circuits and district courts, including district courts within the Ninth Circuit. *See, e.g., United States v. O'Brien*, 895 F.2d 810, 815 (1st Cir.1990); *United States v. Palmer–Contreras*, 835 F.2d 15, 17–18 (1st Cir.1987); *Suppa*, 799 F.2d at 119 (3d Cir.); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir.1985); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir.1985); *United States v. Fortna*, 769 F.2d 243, 251 (5th Cir.1985); *United States v. Hernandez*, 939 F.Supp. 108, 110 (D.Puerto Rico 1996); *United States v. Mesher*, 707 F.Supp. 1224, 1225 (D.Or.1989); *United States v. Moore*, 607 F.Supp. 489, 497 (N.D.Cal.1985).

**1210**

### 3. *No Formal Evidentiary Rules*

"The rules concerning admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the hearing." 18 U.S.C. § 3142(f); *Hernandez, id.* The Federal Rules of Evidence are also inapplicable. Fed.R.Evid. 1101(d)(3); *United States v. Terrones,* 712 F.Supp. 786, 790 (S.D.Cal. 1989). Consequently, both the Government and the defendant may proceed by proffer or hearsay. *Winsor,* 785 F.2d at 756; *United States v. Smith,* 79 F.3d 1208, 1209–10 (D.C.Cir.1996).

### 4. *Danger Verses Flight Risk—Separate Standards of Proof*

The Government has the burden of establishing the defendant is a danger to any person or the community by "clear and convincing evidence." Section 3142(f); *Motamedi,* 767 F.2d at 1406. In contrast, the Government must establish that a defendant is a flight risk by a "preponderance of the evidence." *Motamedi, id.; Winsor,* 785 F.2d at 757.[8]

Guided by the foregoing substantive principles regarding Section 3142, the magistrate judge now turns to the central issue presented by the Application—whether there is a condition of release, or combination of conditions, that will reasonably assure that Kazarian's release will not present a danger or flight risk.

### a. *Danger*

During the June 28 hearing, the Government essentially conceded there are release conditions that can be imposed upon Kazarian to reasonably assure he would not be a danger to any person or the community. The Government also confirmed that, except for Ward, there is no evidence that Kazarian communicated with any of the other members of the alleged conspiracy. More importantly, Ward is the only person to whom Kazarian is known to have conveyed any confidential information that potentially threatened the safety of any law enforcement officer, confidential informant, or any other person. There is also no evidence showing that Kazarian was ever directly involved in actually making and distributing ephedrine, methamphetamine, or any other drugs.[9] Nor is there any evidence indicating that Kazarian is violent.

Meanwhile, during the June 28 hearing, Kazarian's counsel also proffered that his employment with the Orange County District Attorney's Office had been terminated as of that date. Therefore, Kazarian's access to confidential information about criminal investigations or pending cases, as well as his access to computerized, confidential law enforcement databases, is now unavailable to him. Further, in light of the news and publicity about Kazarian's

8. In the initial part of its discussion concerning the proper standard for flight risk, the *Motamedi* opinion states, without authority, a *"clear* preponderance" of the evidence is required. *Id.* at 1406 (emphasis added). However, throughout the balance of the opinion, including its conclusion, the *Motamedi* opinion states the correct standard is "a preponderance" of the evidence. 767 F.2d at 1407 ("we conclude that the congressional silence with regard to the applicable standard of proof in demonstrating risk of flight is the preponderance of the evidence"; "[i]n concluding that the Government's burden in denying bail on the basis of flight risk is that of the preponderance of the evidence, ..."). In any event, despite its later clarification, *Motamedi's* initial use of the "clear preponderance" language has caused some confusion.

*See e.g., United States v. Chen,* 820 F.Supp. 1205, 1209 (N.D.Cal.1992) ("the court is to rule against detention in close cases, applying a 'clear preponderance' test" citing *Motamedi* ); *United States v. Diluzio,* 1991 WL 40884, *2 (E.D.Wash.) ("[i]n the Ninth Circuit, the government must establish the risk of flight by a 'clear preponderance of the evidence' " citing *Motamedi* ).

9. Ward and some of the other defendants have also been indicted for trafficking in cocaine, and the unlawful distribution of Vicodin, a prescription drug that is a Schedule III controlled substance [Indictment, Count One, Part A, ¶¶ 3, Part B, ¶¶ 3–6; Part C, ¶¶ 1–4, 8–10, 12–15, 17; Count Three, Part A, ¶ 1–2].

arrest [10] and his subsequent termination, it is doubtful that any of his former colleagues, friends, or acquaintances in the Orange County District Attorney's Office [11] , or any of his law enforcement contacts, will themselves risk disclosing any confidential information to Kazarian.

Also, Ward and other key members of the alleged conspiracy have been detained pending trial. Consequently, it appears that a condition of release, or combination of such conditions (for example, prohibiting him from contacting or communicating with any of the other defendants, house arrest, intensive pre-trial supervision, and orders limiting his communications to his attorneys and immediate family members), could be imposed upon Kazarian that would reasonably assure that he would not present a danger to the safety of any person or the community if his release was otherwise warranted. Accordingly, the magistrate judge vacates that part of his Detention Order finding there is no condition of release, or combination of conditions, that would reasonably assure the safety of any person or the community [Detention Order, II(b) at 3:10].

### b. *Flight Risk*

The task of determining whether Kazarian will not flee if he is released on bond is more complicated than that for danger.

As discussed above, the Ninth Circuit has held the government has the burden of showing, by a preponderance of the evidence, that there is no condition of release, or combination of conditions, that will reasonably assure Kazarian's appearance at future proceedings if he is released on bond. *Motamedi,* 767 F.2d at 1406–7. However, "reasonably assure the appearance" of the defendant has not been construed to require an ironclad guarantee against flight. *Portes,* 786 F.2d at 764 n. 7 (7th Cir.); *Fortna,* 769 F.2d at 250 (5th Cir.); *United States v. Orta,* 760 F.2d 887, 891–92 (8th Cir.1985).

#### (i) *The Section 3142(e) Presumption*

As previously discussed, at the June 7 hearing, the magistrate judge found probable cause for believing that Kazarian committed a CSA Offense carrying a maximum term of imprisonment of ten or more years. In the interim, a grand jury has indicted Kazarian for the CSA offense [7/17/99 Indictment, Count One]. Therefore, the flight risk analysis begins with a rebuttable presumption that no condition or combination of conditions will reasonably assure Kazarian's appearance if he is released.

#### (ii) *The Section 3142(g) Factors*

A consideration of the Section 3142(g) factors, on balance, also weigh in favor of detention.

On one hand, the Section 3142(g) factors weighing in favor of Kazarian's release are limited to some of the items relating to his

---

**10.** Although it is not part of the record, the magistrate judge observes that news of Kazarian's arrest, including photos of him, made front page headlines of several newspapers in Orange County and was reported by local radio and television stations; Kazarian's situation was compounded by virtue of his position as a deputy district attorney and because one of his alleged co-conspirators is the founding president of the Orange County Chapter of the Hells Angels Motorcycle Club. *See e.g., Los Angeles Times, "Drug Ring Sting Nets O.C. Prosecutor, Crime: Veteran deputy district attorney accused of supplying kingpin with information. Ten others are charged in alleged national operation that made and sold methamphetamine",* front page (6/8/99 Orange County edition), 1999 WL 2166091;

*The Orange County Register, "Prosecutor charged with drug trafficking, Courts: U.S. investigators say his partners in crime included the county's highest ranking Hells Angel,"* front page (6/8/99 edition), 1999 WL 4304008; *and The Daily Pilot, "Deputy DA charged in illegal drug ring, Bryan Kazarian allegedly provided information to friend, who ran illegal drug operation,"* front page (6/8/99 edition).

**11.** During the June 28 hearing, one of Kazarian's counsel stated that he has received several phone calls of support from deputy district attorneys who worked with Kazarian. The magistrate judge does not construe calls of condolences and concern to constitute a threat or danger.

history and characteristics, specifically, (1) his family and community ties, (2) his lack of any prior criminal record, and (3) his lack of a history of drug or alcohol abuse. Also, Kazarian's best hope of regaining any semblance of his pre-arrest life is dependent upon him making all future appearances and obtaining a dismissal of the charges or a favorable verdict.

On the other hand, there are a substantial number of factors weighing against his release and suggesting that he is a flight risk, factors including: (1) the nature of the offense for which Kazarian has been indicted is very serious; (2) Kazarian is facing a term of imprisonment ranging from 24 years to 30 years if he is convicted insofar as the amount of ephedrine seized—106 pounds with an estimated value of $265,000 [12]—which substantially exceeds the minimum amount necessary to trigger the mandatory minimum term of imprisonment of "not less than ten years or more than life" prescribed in 21 U.S.C. § 841(b)(1)(A)(viii); (3) Kazarian's employment with the Orange County District Attorney's Office has been terminated and the deed to his home has been seized; (4) if he is inclined to flee, Kazarian's sophistication with the criminal justice system based upon his experience as a deputy district attorney and his experience in working closely with law enforcement agencies may increase the likelihood that he will succeed [13]; (5) the weight of the evidence against Kazarian appears very strong [14]; (6) the mental and emotional stress of dealing with the adverse publicity from his arrest and termination of employment, the financial difficulties he will face from being unemployed with a wife and two children to support, the fear of being imprisoned with persons who may resent that he was once a prosecutor, and the combined impact and mounting pressure all of these factors may have on him and his family as the trial date approaches, may become too much for him to bear or cope with, as partly evidenced when he broke down and began sobbing immediately after his parents were questioned about acting as sureties during the June 28 hearing [15]; and last, but not least (7) Kazarian's past behavior demonstrates that he is predictably unpredictable.

The last factor is particularly troubling. Kazarian's behavior as a deputy district attorney is so bizarre, and his past actions fall so far below that which can normally and reasonably be expected from a deputy district attorney, that the only reasonable assurance or prediction that can be made is that, if he is released, there is no reasonable assurance that he will respond in a normal, rational fashion to any release conditions that are typically effective as flight deterrents.

To begin with, as a deputy district attorney, Kazarian manifested a critical lapse in judgment by continuing to maintain his friendship with Ward, and continuing to associate with Ward, well after he learned that Ward had been indicted and convicted for drug dealing in Idaho, as discussed below.

Next, there is Kazarian's bizarre act of advising Ward to put certain money into a

12. According to the Indictment, on December 7, 1998, one of the other persons charged in Count One (Arriola) told another co-conspirator (Flanagan) that "the cost of ephedrine had increased to $2,500 per pound" [Indictment, Count One, Part C, ¶ 7]. 106 pounds × $2,500/pound = $265,000.

13. See United States v. O'Brien, 895 F.2d 810, 810 & 816 (1st Cir.1990) (defendant "was a high-ranking federal drug agent for 18 years" before his indictment for drug dealing).

14. In particular, the numerous intercepted communications between Kazarian and Ward establishing, among other things, that Kazarian was passing confidential law enforcement investigative information to Ward about Perry's arrest for the 106 pounds of ephedrine and the related search of Perry's home.

15. See O'Brien, 895 F.2d at 816 (finding the "emotional and financial difficulties [the defendant] is experiencing make his actions less predictably rational" and is a factor in favor of detention).

safe deposit box instead of depositing it into his bank account in order "to prevent the government from finding out about it." According to the Complaint, Kazarian gave this advice to Ward on February 14, 1999 [Complaint, Affidavit, ¶ 41]. Again, this was well after Kazarian knew that Ward had been indicted by an Idaho grand jury for cocaine trafficking, as evidenced by his letter to the Idaho judge dated April 29, 1999, recommending that Ward be released on probation [*Id.*, ¶ 40(b) ], and well after Kazarian knew that Ward had been convicted for drug dealing in the Idaho case based upon their conversation of January 8, 1999, which is discussed below.

During the June 28 hearing, Kazarian, through his counsel, did not dispute having the February 14 conversation with Ward. Instead, Kazarian proffered the source of "the money" was actually Las Vegas gambling winnings, not illicit drug profits, and he attempted to suggest his advice to Ward was simply an imprudent remark. Kazarian's suggestion is without merit. Advising someone to hide gambling income from the government is not simply a careless remark because the willful failure to evade payment of wagering income from "the government" constitutes the crime of income tax evasion—a felony offense under federal law. 26 U.S.C. § 7201[16]; *United States v. Gallo*, 659 F.2d 110 (9th Cir. 1981). Separate and apart from the issue of whether Kazarian's foregoing advice to Ward was made in furtherance of the alleged methamphetamine conspiracy, Kazarian's action also constitutes a clear violation of state law providing an attorney "shall not advise the violation of any law

... unless the member believes in good faith that such law ... is invalid." Cal. B & P.C. § 6068(e), Rule 3–210. Kazarian has not proffered that he had a good-faith belief for believing it was not improper to advise Ward to violate federal tax evasion laws by putting "the money" into a safe deposit box instead of his bank account in order "to prevent the government from finding it."

Another example of Kazarian's unpredictable, bizarre behavior relates to his blatant failure to avoid a clear appearance of impartiality and impropriety by discussing and furnishing Ward with information about Perry's arrest after he knew that Ward was a convicted drug dealer and, given Ward's incessant requests for information, may have been involved with Perry. *See People v. Superior Court of Contra Costa County*, 19 Cal.3d 255, 268, 137 Cal.Rptr. 476, 484, 561 P.2d 1164 (1977). As Justice Stanley Mosk stressed in *Greer*:

> Society also has an interest in both the reality and the appearance of impartiality by its prosecuting officials: "It is essential that the public have absolute confidence in the integrity and impartiality of our system of criminal justice. This requires that public officials not only in fact properly discharge their responsibilities but also that such officials avoid, as much as is possible, the appearance of impropriety." (Fn. omitted.) (People v. Rhodes, 12 Cal.3d 180, 185, 115 Cal.Rptr. 235, 239, 524 P.2d 363, 367 (1974).)

*Greer*, 19 Cal.3d at 268, 137 Cal.Rptr. at 484, 561 P.2d 1164.[17] *See also Lewis v.*

**16.** 26 U.S.C. § 7201 states "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution."

**17.** In *Greer*, the California Supreme Court held a trial court had the inherent power to recuse the district attorney when it appeared he had a conflict of interest which might prejudice him against the accused and thereby affect, or appear to affect, his ability to impartially perform the discretionary functions of his office; the trial court ordered recusal where the murder victim's mother was a clerical employee of the district attorney's office and sympathy for her had permeated the office.

*Superior Court,* 53 Cal.App.4th 1277, 1285, 62 Cal.Rptr.2d 331, 335 (1997).[18]

Consequently, when Ward told Kazarian about Perry's arrest for possessing the ephedrine during their March 24, 1999 conversation, Kazarian had a clear duty to recuse himself from any further involvement with the Perry criminal investigation, as well as a duty to stop speaking with Ward about the same. Kazarian did neither. Even worse, the Government's proffer shows that Kazarian did the exact opposite of what he was required to do by continuing to comply with Ward's repeated requests for confidential law enforcement information pertaining to the Perry investigation. Kazarian's clear conflict and lack of impartiality is all the more glaring given that he was the deputy district attorney in charge of determining whether to commence the state criminal proceedings against Perry concerning the ephedrine. *See People v. Eubanks,* 14 Cal.4th 580, 59 Cal.Rptr.2d 200, 927 P.2d 310 (1997). Indeed, as the California Supreme Court noted in *Eubanks:*

> In California, all criminal prosecutions are conducted in the name of the People of the State of California and by their authority. (Gov.Code, § 100, subd. (b).) ... "The prosecution of criminal offenses on behalf of the People is the sole responsibility of the public prosecutor ... [who] ordinarily has sole discretion to determine whom to charge, what charges to file and pursue, and what punishment to seek."
>
> \* \* \* \* \* \*
>
> The importance, to the public as well as to individuals suspected or accused of crimes, that these discretionary functions be exercised "with the highest degree of integrity and impartiality, and

with the appearance thereof" [citation omitted] cannot easily be overstated....

> The nature of the impartiality required of the public prosecutor follows from the prosecutor's role as representative of the People as a body, rather than as individuals. "The prosecutor speaks not solely for the victim, or the police, or those who support them, but for all the People. That body of 'The People' includes the defendant and his family and those who care about him. [citation omitted] It also includes the vast majority of citizens who know nothing about a particular case, but who give over to the prosecutor the authority to seek a just result in their name." ... Thus the district attorney is expected to exercise his or her discretionary functions in the interests of the People at large, and not under the influence or control of an interested individual.

14 Cal.4th at 588–91, 59 Cal.Rptr.2d at 205–07, 927 P.2d 310.

In sum, inherent in any finding that the Court is reasonably assured that Kazarian will make all future appearances if he is released subject to certain conditions is an assumption that he will respond in a normal, predictable fashion to the release conditions imposed upon him. When Kazarian's past behavior is weighed along with the other Section 3142(g) factors, the magistrate judge finds the factors favoring detention substantially outweigh those favoring release. In particular, Kazarian's past acts provide little confidence, let alone a reasonable assurance, that any conditions of release will deter him from being a flight risk. Upon close review, this is not a close case.

---

**18.** In *Lewis,* the California Court of Appeal for the Fourth Appellate District, Division Two, granted the petitioner's writ of mandate/prohibition challenging a trial court order denying his motion seeking to have the District Attorney ("DA") recused from prosecuting an action seeking the petitioner's removal from office because of the DA's personal involvement with a three-person committee charged with determining if petitioner should resign; ("[w]hen dealing with appearances of conflict, we are concerned with public perception[;] considering this evidence, there is a serious danger this perception will be adverse to the integrity of Orange County's justice system").

### (iii) *Additional Proffers*

Both parties made additional proffers at the June 28 hearing.

Kazarian, in an apparent effort to rebut the Section 3142(e) presumption, argued that he is a fighter, not a flight risk. Further, Kazarian proffered nearly $1.6 million of real property to secure a release bond. The property consists of four personal residences that are owned, respectively, by his parents, his sister and brother-in-law, and two sets of aunts and uncles. Pre–Trial Services has interviewed these individuals and has confirmed they are willing to post the foregoing properties on Kazarian's behalf to secure a release bond.

The Government responded to Kazarian's rebuttal and foregoing argument by proffering the following audio taped excerpt from one of the many intercepted communications between Kazarian and Ward that occurred on January 8, 1999. The excerpt was introduced as evidence and played during the June 28 hearing. After the hearing, and with the permission of counsel for the Government and Kazarian, the magistrate judge obtained the audio tape from the Government's counsel and listened to the excerpt several times, very carefully. As part of his inquiry to determine if the $1.6 million in property would be sufficient collateral for a proposed bond in light of the Government's rebuttal, the magistrate judge also listened to that part of the conversation immediately preceding the excerpt in order to ascertain the appropriate context.

In their conversation immediately preceding the following excerpt, Ward informed Kazarian about his conviction in his Idaho drug dealing case.[19] Ward also tells Kazarian his bail was initially set at $100,000 but lowered to $20,000, and then reduced again to $12,500 after his conviction.

Ward expressed surprise that his bail had been reduced and, when he asked Kazarian if the bail amount should actually be "going the other way," Kazarian agreed and noted, "especially since you have more to flee from now that you've been sentenced to three [years]." Kazarian also commented that, in hindsight, "all the beautiful analysis," and "all the great legal defenses and legal things that *we'd* given you were all bulls__t anyway because nothing was going to help" since the Idaho court was like a "Kangaroo Court" (emphasis added). After some unrelated discussion about a gang case that Kazarian was prosecuting, Ward segued to the following subject, which led to the following colloquy:

Ward(W): Hey, what about my boy, f__kin' Hambarian, down the street here; he's in a little trouble, huh?

Kazarian (K): **You know, he's my, one of my family.**

W: I didn't know that.

K: **Yeah, he's like a cousin, his dad is like, his dad is like related to me somehow.**

W: Sam is like a f__kin' good old man, though.

K: Yeah.

W: The kid's a kinda dick. That kid lives right down the street from my buddy with the limo place.

K: Yeah, he's (garbled); look they got his house and everything.

W: They grabbed his house and everything?

K: Yeah, they froze everything.

W: Yup. **And I don't know if he can make bail.**

---

19. Ward does not expressly identify the case as his Idaho case; however, there is no doubt this is the case he is alluding to based upon (1) his criticisms of the district attorney's reference to him as a "drug dealer"; (2) his comments that, because the judge found he was "a first time offender," he was fined $25,000 and "given three years fixed"; and (3) Kazarian's comment that some of the things that occurred in that case would never have happened in California.

K: I don't think he can—$4 million something bail.

W: It was $2.5, I heard.

K: Yeah, whatever it is, whatever it is, it's outrageous.

W: I don't know why the dad doesn't f__kin' spring him.

K: Yeah.

W: 'Cause the old man's got f__kin' multi-money.

K: Yeah.

W: He's got huge money, so, who knows, huh?

K: Yeah. So ...

W: I think, I think he's going to the pen for a while; what do you think?

K: Yeah.

W: Yeah, he stole a lot of money, huh?

K: Yeah, millions, man.

W: Yeah, **I think he's going to the pen for ten.**

K: He stole millions, millions of dollars.

W: **He just ought to f__kin' get out and jump it in bail.**

K: **Heh, heh, heh, heh.**

W: *Yeah, I mean, really.*

K: *Yeah, I would. I'd get out and go to Cuba.*

W: *Exactly.*

K: *Heh, heh.*

W: *He oughta go to a non-extradition company, country.*

K: *Yeah. Yeah, that's right. That's why I'd go to Cuba or some s__t. Heh, heh.*

W: *Somewhere like Costa Rica or something.*

K: (Cough) *Yeah.*

W: So who knows, f__k it.

K: Hey, I'm sorry to hear about that, man.

W: Hey, okay, no biggie. Hey (inaudible) could be f__kin' worse, huh?

K: Yeah, you could be in jail, I guess.

W: Yeah, you know, I guess I could be, huh?

K: Yeah.

W: Instead of f__kin' putting my license plate on my Harley, I could be in jail today. (Short laugh)

[Government 1/8/99 Tape, at 930 (emphasis added) ].[20]

Kazarian met his burden of producing some evidence to rebut the Section 3142(e) presumption by proffering nearly $1.6 million of family property to secure a release bond. However, by proffering Kazarian's "I'd flee to Cuba" statements in response, the Government met its burden of persuasion and fortified the Section 3142(e) presumption that Kazarian is a flight risk. Kazarian's same remarks also impeach and refute his proffer that $1.6 million of family property would reasonably assure his attendance at trial. On the contrary, Kazarian's revelation provides the Court with a reasonable assurance that he will flee if released, and that even $2.5 million dollars of family property, let alone $1.6 million,

**20.** The reference to "Hambarian" appears to refer to Jeffery Hambarian. According to news reports, Hambarian was the former. operator of a family-owned waste and recycling business founded by his father (whose name is Sam) and mother, which was the waste hauler for the City of Orange for many years, until he was indicted in mid-December, 1998, and charged with embezzling about $4.2 million dollars from the City of Orange. On January 7, 1999—the day before Ward and Kazarian had their foregoing conversation—it was reported that an Orange County Superior Court judge refused to reduce Hambarian's $2.5 million dollar bail that had been previously set. [See Orange County Register, Metro Section, *"High Bail kept in Orange trash case,"* (1/7/99 edition), 1999 WL 4278274]. Later news reports indicate that Hambarian's bail was reduced, and that he was ultimately released subject to a $500,000 bond [See e.g., Los Angeles Times, Metro Section (12/18/98 edition), 1998 WL 18905002; *id.* (3/5/99 edition), 1999 WL 2135979; *id.* (3/30/99 edition), 1999 WL 2143979].

would not stop him from becoming a fugitive if he was facing a possible "ten in the pen," less than one-half of the 24 to 30 year sentence that he is actually facing if he is convicted in the pending case. The Government's proffer provides a rather remarkable, uncanny glimpse of what Kazarian is likely to do as expressed by Kazarian himself. It is also further evidence of Kazarian's bizarre behavior.

Kazarian's attempts to downplay and undermine the significance of his "flee to Cuba" statements during the June 28 hearing are without merit and are rejected.

To begin with, he had the option of telling Ward that he would not flee to Cuba or anywhere else, but would stay and fight the charges if he were Hambarian. Instead, Kazarian not only said he would flee, but he made it clear that he selected Cuba as his country of choice because he knows he could not be extradited. In any event, one can reasonably expect that a prosecutor is fully capable of selecting and using words that clearly convey and express his or her true intentions and desires, and a verbalized indication of his intent to become a fugitive if he is released should and must be taken seriously.

Kazarian's remark also refutes and impeaches his argument that he is a fighter and that he would stay and fight the pending charges if released. In blunt terms, his spontaneous remark is not characteristic of a person with the courage to face and fight a lengthy prison sentence, particularly one that would be served in a federal penitentiary occupied by some inmates who may be similar to those he used to prosecute and may make his confinement more difficult.

Kazarian's attempt to suggest that he was just joking is equally unpersuasive. Although he chuckled in response to Ward's initial comment about fleeing if he were Hambarian, Ward immediately made it clear that he was "really" serious. Kazarian not only promptly responded that he would do the same, but he specifically added, without any hesitation or reservation, that he would "get out and go to Cuba." Further, Kazarian never said he was joking.

Kazarian's immediate selection of Cuba as the place he would flee is not trivial. The World is a big place to hide. However, if one is going to flee, there is no better place to go than a country that will not cooperate or honor this Country's request for extradition. Cuba is one such country and is known to be a place where fugitives flee in order to frustrate law enforcement's efforts to bring them to justice. *United States v. Cherry*, 10 F.3d 1003, 1010 (3d Cir.1993) ("According to Federal Bureau of Investigation records, Cherry fled the United States after being warned that he was wanted by authorities as a suspect in the murder of Officer Burke. [citation omitted.] Cherry's unlawful flight to Cuba and his unusually long absence in a country from which he could not be extradited frustrated law enforcement efforts to prosecute the murder of Officer Burke"). Indeed, when Ward added he would flee to a "non-extradition" country, Kazarian expressly emphasized that is why *he* would go to Cuba or a similar country. In this regard, Kazarian's argument that he has never been to Cuba, and that Cuba is not even allowing United States citizens to enter, misses the point because, as already noted, Cuba is not the only place on the planet to hide and avoid extradition.

Kazarian's remark that he would flee to Cuba if he were Hambarian is also very significant because it establishes that a bond secured by property owned by persons with whom he has close personal ties would not reasonably assure his appearances. As noted above, Hambarian is like a cousin to Kazarian. Both Kazarian and Ward agreed that Sam, Hambarian's father, was a "good man", and they both indicated that Hambarian would probably not be able to post the $2.5 million dollar bail without Sam's help. Nonetheless, Kazarian said he would still flee if he were

Hambarian, even though it would mean Hambarian's father, the most likely person with the financial resources to secure a $2.5 million bond, would lose the entire $2.5 in collateral. In this regard, the Government's proffer negates Kazarian's close family ties as a factor weighing in favor of his release.

"Past acts of a defendant are a valid basis with which to predict future conduct." *United States v. Flores,* 856 F.Supp. 1400, 1408 (E.D.Cal.1994). Here, Kazarian's past words, combined with his past acts—which are bizarre and unpredictable for a deputy district attorney— lead the magistrate judge to conclude he is both a risk-taker and a flight risk. By indicating that he would flee if he were Hambarian and forfeit $2.5 million in bail in order to avoid serving a possible ten year sentence, it is reasonable to expect that Kazarian would have even fewer reservations about fleeing in his own case if he is released on a bond that is secured by $1.6 million of family property, where he is facing a 24 to 30 year sentence.

The Government has met its burden of establishing by a preponderance of the evidence, if not a "clear preponderance," [21] that there is no condition, or combination of conditions, that will reasonably assure Kazarian's appearance at future proceedings in this matter. The Government has also met its burden of persuasion.

Tragically, this is one of those "rare circumstances" where release must be denied, *Gebro,* 948 F.2d at 1121, and, given Kazarian's own revelation, it would be irresponsible to order Kazarian's release under these unique circumstances.

### ORDER

For the reasons explained in the foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. To the extent Kazarian's Application requests the magistrate judge to reopen the detention hearing of June 7, 1999, and reconsider the Detention Order, the Application is GRANTED IN PART in that the detention hearing of June 7, 1999, is deemed to have been reopened to include the parties' respective proffers and arguments that were made during the hearing of June 28, 1999.

2. the extent Kazarian's Application requests the magistrate judge to vacate the Detention Order and issue an order releasing him, the Application is DENIED. However, the portion of the Detention Order set forth at Part II(B), page 2:10, finding there is no condition or combination of conditions that would reasonably assure the safety of any person or the community, is vacated. Except as expressly noted, the balance of the Detention Order remains unchanged and is deemed to be augmented and modified by this Memorandum and Order, particularly with respect to the finding that there is no condition or combination of conditions that will reasonably assure Kazarian's appearance at trial.

IT IS SO ORDERED.